Arthur James JULIUS,
Petitioner–Appellant,

v.

W.J. JOHNSON, Warden, Holman Unit,
Respondent–Appellee.

No. 86–7589.

United States Court of Appeals,
Eleventh Circuit.

March 9, 1988.

---

Thomas M. Goggans, Montgomery, Ala., for petitioner-appellant.

Charles Graddick, Atty. Gen. of Alabama, John Gibbs, Ed Carnes, Asst. Attys. Gen., Montgomery, Ala., for respondent-appellee.

Before VANCE, HATCHETT and CLARK, Circuit Judges.

PER CURIAM:

Arthur James Julius appeals from the district court order denying his petition for a writ of habeas corpus. We affirm.

Julius pled guilty to a murder charge in 1972 and was sentenced to life imprisonment. In 1978, while on a one-day release from prison, Julius allegedly raped and murdered his cousin Susie Sanders. He was tried, found guilty, and sentenced to death. His conviction was reversed, *see* 407 So.2d 152 (Ala.1981), pursuant to the United States Supreme Court's ruling that Alabama's death penalty statute was unconstitutional. *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). After *Beck,* the Alabama Supreme Court severed the unconstitutional portion of the statute. *Beck v. State,* 396 So.2d 645 (Ala. 1980). Julius was then retried for the 1978 murder under the modified statute in 1982.

He was again found guilty and sentenced to death.

The evidence presented at trial indicated that Susie Sanders was brutally raped and murdered on January 29, 1978. Her body was discovered in her home by her father, E.O. Sanders. Mr. Sanders testified that when he and the victim's daughter entered the house, they saw Susie's nude body on a couch with her head on the floor and her legs in the air. Trial Transcript Vol. I at 19–20. Furniture had been knocked over and the telephone cord had been pulled from the wall. Forensic examinations indicated traces of semen in the victim's vagina, anus, and mouth. *Id.* Vol. II at 205. Seminal fluid also covered the length of a plastic banana found near the body. *Id.* Vol. I at 147. Her body was covered with bruises, abrasions, and "rub burns" indicating that she had been dragged across the carpet. *Id.* at 197–201, 208. Handfuls of her head hair were found near the body. *Id.* at 118. An autopsy revealed that the cause of death was manual strangulation, probably inflicted from behind. *Id.* Vol. II at 205.

The state presented circumstantial evidence that this crime was committed by Susie Sanders' first cousin Arthur Julius, the appellant. Willie Clayton, another cousin of Julius, checked Julius out of the Draper Work Release Center at 11:40 a.m. on January 29, 1978. As they drove to Montgomery, Alabama, Julius asked Clayton when he had last seen Susie Sanders. Trial Transcript Vol. I at 49. Clayton loaned Julius his car at 3:30 p.m. and did not see Julius again until 6:30 p.m.

William Gray, the victim's neighbor, testified that he saw Clayton's car parked outside the victim's house at approximately 5:15 p.m. Trial Transcript Vol. I at 62. Ruth Wheeler, the victim's second cousin, testified that she called Susie on the telephone at approximately 4:00 p.m. on January 29. Susie said she would have to call Ms. Wheeler back because she was talking to her cousin "Bobo." *Id.* Vol. II at 223. Fanny Sanders, the victim's mother, testified that Susie referred to her cousin Arthur Julius as Bobo. *Id.* Vol. I at 28.

At 6:30 p.m., Julius returned the car to Clayton, who had been visiting his brother-in-law, Orin Henderson. Henderson testified that Julius had a "fresh" cut under his eye. Trial Transcript Vol. I at 57. Clayton and Julius then drove back to the Draper Work Release Center. After Julius was checked in, he told Draper counselor Everett Rich that he was expecting an emergency telephone call. *Id.* at 68. Later, Julius told Rich he had received a call and learned that his cousin had been robbed and killed. *Id.* at 69. Julius said he had been at his cousin's house that day, but that she was all right when he left. *Id.*

Andrew Boykin, the victim's fiance, testified that he gave Susie approximately $30 on the morning of January 28. Trial Transcript Vol. I at 73. Because Susie was ill, she did not leave the house all weekend. Boykin, a bus driver, was called to work on January 29, and his employer's records indicate he drove a bus from Montgomery to Meridian, Mississippi and did not return until the following morning. John Byers, a former desk officer at Draper, testified that Julius had a little over $30 and a carton of cigarettes when he returned to Draper at 7:40 p.m. on January 29. *Id.* at 81. According to Willie Clayton, Julius stated at 11:40 that morning that he had only eight cents in his pockets. *Id.* at 49.

The state also relied on forensic evidence. A toxicologist testified that hair found in Julius' underwear on January 29 had the same characteristics as the victim's head hair and that the hair could not have come from Julius. Trial Transcript Vol. I at 151–54. The same witness testified that various fibers found on Julius' body and clothing were the same as fibers found in the victim's house. *Id.* at 175.

Finally, the state detailed inconsistencies in Julius' prior explanations of his activities on January 29. When Julius returned to Draper on January 29, he told Everett Rich that he had been at his cousin's house earlier that day. In a statement made shortly after his arrest, however, Julius denied that he saw Susie Sanders on January 29. Julius said that after he borrowed Clayton's car at 3:00 p.m., he met a girl

near his uncle's house. After he had sex with the girl, he said he brought her back to where they had met. He then got some gas for the car and went to the governor's mansion to see a friend who worked there. He went back to his uncle's house and then went to pick up Clayton for the ride back to Draper. Trial Transcript Vol. I at 100–01. This statement differs somewhat from Julius' testimony at his first trial. The transcript of this testimony was read into the record at the second trial. Julius testified that he drove to his uncle's house at 3:30 p.m. and stayed there for approximately 30 minutes. He then left his uncle's house and headed for a nearby restaurant. On the way, he said he stopped to call his aunt (the victim's mother) Fanny Sanders to ask for money. She supposedly suggested that they meet to have sex, as they allegedly had done several times in the past, in a nearby motel. She did not have time to go to the motel, so they had sex in Clayton's car. Trial Transcript Vol. II at 246. Julius claims Fanny Sanders scratched his eye during their sexual encounter while attempting to remove his glasses. *Id.* at 252. Julius testified that Fanny Sanders gave him a carton of cigarettes and $50 in cash, some of which he spent on gasoline. *Id.* at 257.

Julius' only defense witness was Joanne Minnefield, who testified that she had never heard Julius referred to as Bobo. On cross-examination, however, Minnefield conceded that she had only seen Julius and Susie Sanders together twice. After Minnefield testified, the state was permitted to call one more witness, Jessie Bullard. He testified that he met Julius at the victim's home. Although he could not recall the exact nickname Susie used to describe Julius, he said "it was Jabbo, Bobo, Lobo or something." *Id.* at 265.

The jury was persuaded by the circumstantial evidence and found Julius guilty of: (1) murder committed by a defendant while under a sentence of life imprisonment, Ala.Code § 13–11–2(6); and (2) murder by a defendant who has been convicted of any other murder in the twenty years preceding the crime, Ala.Code § 13–11–2(13).[1] The trial court, accepting the jury's recommendation for the death sentence and after reviewing a presentencing report, found the following aggravating factors:

(1) The capital felony was committed by the defendant while under a sentence of imprisonment [Ala.Code § 13–11–6(1)];

(2) The defendant was previously convicted of another felony involving the use or threat of violence to the person [Ala. Code § 13–11–6(2)]; and

(3) The capital felony was especially heinous, atrocious, and cruel [Ala.Code § 13–11–6(8)].

The only mitigating circumstance was that Julius was 32 years old at the time of the crime. *See* Ala.Code § 13–11–7(7). The Alabama Court of Criminal Appeals (455 So.2d 975 (1983)) and the Alabama Supreme Court (455 So.2d 984 (1984)) affirmed.

Julius, proceeding pro se, came to the district court seeking his release and monetary damages on the ground that he was deprived of his purported right to act as co-counsel at trial. This claim was rejected and we affirmed. *Julius v. Johnson,* 755 F.2d 1403 (11th Cir.1985). The state stipulated it would not assert abuse of the writ as a defense against a second habeas petition. *Id.* at 1404.

Julius then obtained counsel and sought collateral relief from his conviction and sentence in a state coram nobis proceeding. After an evidentiary hearing, the trial court denied relief and issued a thorough opinion. Several of Julius' claims were rejected on their merits and several were deemed to be barred by Julius' failure to raise them at trial or on direct appeal. On

---

1. The Alabama death penalty statute has been amended since Julius' second trial. For the sake of clarity, any refences to the statute in this opinion are to the 1975 statute as it existed at the time Julius was tried.

 Under the statute, a murder could be punished by death only if it was accompanied by one of the "aggravating" factors listed in Ala. Code § 13–11–2. The state opened its case in chief by introducing evidence of Julius' prior murder conviction and the fact that Julius was serving a life sentence when the crime was allegedly committed. Trial Transcript, Vol. I at 9.

April 7, 1986, the Alabama Court of Criminal Appeals affirmed without opinion. The Alabama Supreme Court denied certiorari on September 26, 1986.

Julius sought habeas corpus relief in the district court pursuant to 28 U.S.C. § 2254. The district court, relying heavily upon the state court's opinion in the coram nobis proceeding,[2] rejected Julius' claims and denied the writ. This appeal followed.

On appeal, Julius presents ten claims for relief: (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel; (3) erroneous jury instructions regarding the lesser included offense of manslaughter; (4) double counting of aggravating circumstances in the guilt and penalty phases of the trial; (5) prosecutorial misconduct during closing arguments; (6) the use of the 1972 murder conviction, with a cautionary instruction, during the guilt phase; (7) the absence of a transcript of the jury qualification proceeding in the Alabama appellate court record; (8) the use of Julius' testimony from his prior trial during the guilt phase without a proper explanatory instruction; (9) the use, as an aggravating circumstance, of the 1972 murder conviction obtained pursuant to an unconstitutional death penalty statute; and (10) retrial under a judicially rewritten death penalty statute. We reach the merits of the first four issues. Issues five through ten are barred because of Julius' failure to timely raise these claims in the state courts and because Julius has failed to show cause for his procedural default.

## I. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Julius points to many alleged "errors" committed by trial counsel which, according to the petition, constituted a denial of his right to effective assistance of counsel. We analyze these claims under the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail on his ineffective assist-

ance claim, Julius must show: (1) that counsel's performance was outside the wide range of reasonable professional conduct; and (2) that the deficiency of counsel's performance had an effect on the conviction or sentence. *Id.* at 688–91, 104 S.Ct. at 2065–66.

### A. Guilt Phase

Julius' claims that counsel was ineffective during the guilt phase can be broken down into two categories. First, there are several alleged errors of omission—instances where counsel failed to effectively assert (either by objection or by motion) Julius' constitutional rights. Second, Julius alleges his counsel's closing argument prejudiced his defense.

#### 1. Alleged Errors of Omission

According to the petition, counsel was ineffective because he failed to: (1) object to several comments made by the prosecutor during closing argument; (2) object or make a motion for a mistrial when the word "murder" was used to describe the crime committed in this case; (3) protect Julius' "right" to act as co-counsel; (4) object to the use of the 1972 murder conviction which was obtained pursuant to an unconstitutional death penalty statute; (5) request an instruction informing the jury not to consider the 1972 conviction as evidence of guilt; (6) object to the use of a transcript of Julius' testimony from his 1978 trial; and (7) object to Julius' retrial under a judicially rewritten death penalty statute.

After reviewing the records of the trial and state coram nobis proceedings, we conclude that none of the alleged "errors" rises to the level of ineffective assistance of counsel. Counsel's failure to object to the prosecutor's comments during closing argument was a deliberate tactical choice. At the coram nobis proceeding, counsel testified that he believes objections during closing argument merely focus the

---

2. Julius complains that the district court erred in relying on the state court's legal conclusions. It is true that the district court is *bound* only by the state court's factual determinations. How-

ever, nothing precludes the district court from relying on the state court's legal conclusions as *persuasive* authority.

jury's attention on the damaging remarks. His practice is not to object unless the prosecutor's remarks are clearly prejudicial. Since none of the challenged comments were overwhelmingly prejudiced or persuasive, we will not question this tactical decision. Similarly, we will not question counsel's decision not to object to the use of the word "murder" by the prosecutor and by a witness during the trial. Julius' sole defense at trial was that he did not commit the crime. Counsel did not choose to make the alternative argument that Julius committed the crime but that the crime was something other than murder. Given the evidence presented at trial, Julius was not prejudiced by counsel's failure to object to the use of the word "murder," even if such an objection would have been sustained.

 Counsel communicated to the court Julius' request that he be permitted to act as co-counsel. As a result, Julius was permitted to preface his counsel's closing argument at the guilt phase with some remarks of his own. Even if counsel did not "effectively" advance Julius' desire to act as co-counsel, this failure would not entitle Julius to relief. We have held that Julius did not have a federally protected right to act as co-counsel in his criminal trial. *Julius,* 755 F.2d at 1404. The state coram nobis court found that the state constitution did not afford such a right. Under these circumstances, counsel's failure to assert Julius' request more forcefully does not constitute ineffective assistance.

Appellant argues that defense counsel should have objected to the introduction of the 1972 conviction during the guilty phase and that he was additionally ineffective in failing to request a cautionary instruction advising the jurors that they should not consider the prior conviction in deciding whether Julius was guilty in this trial. To understand this issue it is necessary to review portions of Alabama's death penalty statute as it existed when Julius was tried. A defendant could be sentenced to death if

he committed murder under one of fourteen different circumstances, only two of which are relevant here: murder committed while the defendant is under sentence of life imprisonment; and murder by a defendant who has been convicted of any other murder in the 20 years preceding the crime. Ala.Code § 13–11–2(6), (13).

Julius was charged with the intentional killing of Susie Sanders at a time when he was under a sentence of life imprisonment and had been convicted of another murder during the previous 20 years. The state made the previous conviction an element of the crime of murdering Susie Sanders and the trial court admitted evidence of the prior conviction. Appellant argues several grounds for constitutional error arising from these circumstances.

Defense counsel is charged with ineffectiveness in not objecting to the admission of the prior conviction and after its admission not requesting a cautionary instruction. Additionally, Julius charges that the state's use of the prior conviction in the guilt/innocence phase and again as an aggravating circumstance in the sentencing phase constituted an overlapping of aggravating circumstances, depriving him of an individualized sentencing proceeding, and rendering this phase of his trial fundamentally unfair because the jury was prejudiced by the admission of his prior conviction.[3] We will discuss first the overlapping or double counting issue.

To obtain a capital murder conviction, the state was required to prove that Julius committed either first or second degree murder *and* that this murder was "aggravated" by one of the factors listed in Ala. Code § 13–11–2. The "aggravating" factors in this case were that the murder was committed while Julius was serving a life sentence (§ 13–11–2(6)) and that Julius had committed another murder in the twenty years preceding the crime (§ 13–11–2(13)). After the jury returned its guilty verdict, the state used these same two factors as "aggravating circumstances"

---

**3.** This issue involves no assertion of ineffective assistance of counsel. We discuss this issue here because of its close relationship to the two issues involving ineffective assistance of counsel.

during the sentencing phase. The trial court specifically instructed the jurors that by their guilty verdict, they had already accepted these two facts as aggravating circumstances for the penalty phase.[4] The only other aggravating circumstance alleged by the state in the penalty phase was that the crime was especially heinous, atrocious and cruel.

Julius contends that the use of the two overlapping aggravating circumstances deprived him of an individualized sentencing determination and, in fact, had the effect of making the death penalty mandatory in this case. We disagree. We have rejected a similar challenge to Florida's death penalty statute. In *Adams v. Wainwright,* 709 F.2d 1443 (11th Cir.1983), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984), the defendant was convicted of felony murder. The defendant argued that "Florida has impermissibly made the death penalty the 'automatically preferred sentence' in any felony murder case because one of the statutory aggravating factors is the murder taking place during the course of the felony." *Id.* at 1447. This argument, which is the same argument raised by Julius, was rejected because the Supreme Court had upheld the Florida statute, "including necessarily the use of this statutory aggravating factor" in *Proffitt v. Wainwright,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

Furthermore, we indicated that the sentencing phase remains an individualized determination because the defendant has the opportunity to present mitigating evidence. 709 F.2d at 1447. This argument has been used by the Fifth Circuit to defeat challenges similar to the one raised in this case. *See Welcome v. Blackburn,* 793 F.2d 672, 676 (5th Cir.1986); *Glass v. Blackburn,* 791 F.2d 1165, 1173 (5th Cir.1986) *(dicta );* *Wingo v. Blackburn,* 783 F.2d 1046, 1051 (5th Cir.1986) ("we fail to see why aggravating circumstances narrow the sentencing discretion any less by being made a constituent element of the crime."). *But*

*see Collins v. Lockhart,* 754 F.2d 258, 261–65 (8th Cir.) ("we see no escape from the conclusion that an aggravating circumstance which merely repeats an element of the underlying crime cannot perform [the] narrowing function"), *cert. denied,* 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985); *Wiley v. Mississippi,* — U.S. —, 107 S.Ct. 304, 306, 93 L.Ed.2d 278 (1986) (Marshall J. with Brennan J. dissenting from denial of certiorari). We are bound by *Adams* to reject Julius' argument that the double counting of aggravating circumstances violated his constitutional rights.

Turning to the charge that his counsel was ineffective, Julius argues that admission of the prior offense violated his right to a fundamentally fair trial. We find that counsel was ineffective for not objecting. The issue had been raised in 1979 in Alabama in *Hubbard v. State,* 382 So.2d 577 (Ala.Cr.App.). Julius was retried subsequent to that time and counsel should have raised the issue to lay the basis of a later constitutional challenge in a federal proceeding, assuming that the Alabama courts would have adhered to their position in *Hubbard.*

However, in the interim, the issue has been put to rest by the Supreme Court in *Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983). There, Marshall had been convicted by an Ohio court and given the death penalty. The Ohio statute permitted the state in an aggravated murder case to include in the indictment a "specification" in which the state could allege that the respondent previously had been convicted of an "offense of which the gist was the purposeful killing of or attempt to kill another." *See* Ohio Rev.Code Ann. § 2929.04(A)(5) (1975). In the guilt/innocence phase, the jury was entitled to hear evidence of a past conviction similar to the evidence under attack here. In note 6, the Court reaffirmed *Spencer v. Texas,* 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967), holding that the defendant's due process rights were not

---

4. Since preparation of this opinion, the Supreme Court has held that under a Louisiana statute, different in some respects from the Ala-

bama statute, overlapping does not constitute a violation of the Constitution. *Lowenfield v. Phelps,* 42 Crim.L.Rep. 3029 (Jan. 13, 1988).

violated by the introduction of his previous conviction in the guilt/innocence phase of the trial. Appellant had relied upon *Spencer* in urging this claim. The opinion and dissent in *Spencer* make clear that at the present time the practice of using evidence of a past conviction in the trial of Alabama death cases is permissible under the Constitution.

 *Marshall* does support appellant's claim that counsel was ineffective for failing to request a cautionary instruction respecting the 1972 conviction. We hold that counsel was ineffective. Justice Rehnquist (now Chief Justice) writing for the majority in *Marshall* relied on the fact that when "evidence [of a prior conviction] was accompanied by instruction limiting the jury's use of the conviction to sentence enhancement," the defendant's due process rights were not violated. Consequently, the absence of an instruction may amount to a constitutional violation.

We do not reach that question because we fail to find that the defendant was prejudiced in this case. Although the evidence convicting Julius was all circumstantial, it was overwhelming. We cannot conceive that any retrial of Julius with the cautionary instruction could reach a different result.

 Respecting Julius' sixth claim, we hold that counsel was not ineffective for his failure to object when a transcript of Julius' testimony at the 1978 trial was read into the record at the 1982 trial. Julius' prior testimony consisted mostly of his attempts to explain his whereabouts on the day of the crime. These statements were clearly relevant and admissible. The prosecutor's fleeting reference to the facts of the 1972 murder during the prior testimony was not enough to mandate, as a matter of

professional competence, that counsel object to the introduction of the transcript. Furthermore, counsel's failure to object when the trial court told the jury to consider the prior testimony "as if Julius was on the stand testifying" does not constitute ineffective assistance. The court's remarks did not, as Julius suggests, draw attention to Julius' decision not to testify at the second trial. Even if they did draw attention to this fact, an objection by counsel would have served only to draw additional attention to Julius' failure to testify. Given counsel's strategy of objecting only when necessary, we do not believe counsel's failure to object to the court's remarks was unreasonable.

[8] Finally, counsel was not ineffective for failing to object to Julius' retrial under a judicially rewritten death penalty statute. The Supreme Court's holding in *Beck v. Alabama* did not bar the state from reprosecuting the defendant in that case. *See Beck v. State*, 396 So.2d 645 (Ala.1980). *Cf. Jordan v. Watkins*, 681 F.2d 1067, 1077–80 (5th Cir.1982) (rejecting constitutional challenges to retrial under Mississippi's judicially rewritten death penalty statute), *clarified on reh'g sub nom. Jordan v. Thigpen*, 688 F.2d 395 (5th Cir.1982). Counsel had no basis to object to the reprosecution in this case, and therefore cannot be faulted for his failure to object.

## II. ALLEGED ERRORS OF COMMISSION

 Julius contends counsel's closing argument during the guilt phase of the trial was prejudicial to his defense. Specifically, Julius points to counsel's comments praising the work of the two prosecuting attorneys [5] and counsel's comment that he

---

**5.** Toward the end of his closing argument, defense counsel stated:

And in closing, I want to thank the District Attorney's office in this case, because they have made my job harder, much, much, harder than it would have been had it been one of these ranting and raving type District Attorneys that wants to do more hollering and things like that than to try a lawsuit. I want to thank them for being gentlemen, and yet they have certainly made my job far more

difficult because it's no trouble—anytime you've got a lawyer that gets up here and goes to hollering and stomping their feet and shaking their fists, its easier to deal with them than it is two of the finest young men that I know of that know what they are doing and know how to present cases and know how to do it in a highly dignified manner. And even though they might have worked me, they are to be complimented for the job done, because

zealously defends his clients regardless of their character.[6] At the state coram nobis hearing, counsel testified that he praised the prosecuting attorneys in order to assure the jury that the trial was not a personal contest between the attorneys. The coram nobis court noted that the prosecutors were personable young lawyers and counsel was merely attempting to neutralize the effect of their personal appeal. Coram Nobis Op. at 17. We see nothing inappropriate in counsel's comments and further note that they did not prejudice Julius' defense. As to counsel's comment regarding his responsibility to defend his clients, counsel was attempting to remind the jury of its duty to be fair to the defendant. Coram Nobis Transcript at 87. Counsel testified that he was not attempting to distance himself from his client. *Id.* We agree with the coram nobis court that counsel's comments did not prejudice Julius' defense. Even if counsel's arguments were not particularly helpful, they certainly were not harmful enough to undermine our confidence in the correctness of the jury's verdict.

## A. *Penalty Phase*

■ Julius claims counsel failed to present all the available mitigating evidence during the sentence phase. The coram nobis court made detailed factual findings that counsel zealously tracked down all leads to mitigating evidence. Counsel simply made the informed decision that the best way to save Julius' life was to argue to the jury that there was still some doubt whether or not Julius committed the crime. Given the brutal nature of the crime, we conclude that such a decision was within the range of professional competence.

Furthermore, we agree with the state coram nobis court that the proposed testimony of family members and friends would not have affected the outcome. Accordingly, Julius is not entitled to relief on this ground.

■ Second, Julius alleges counsel's closing argument was ineffective because counsel distanced himself from his client and because counsel failed to argue persuasively for Julius' life. Specifically, Julius objects to the following comment made by his counsel during closing argument:

> May it please the Court, members of the jury. I don't know, to tell you the truth, whether I am asking you to spare Arthur Julius' life, or whether I'm up here to make sure that you know what you are doing.

Supplemental Trial Transcript at 46. Julius' argument is meritless because this comment, in the context of the entire argument, did not prejudice his case. Counsel's argument was quite different from the argument we criticized in *King v. Strickland,* 714 F.2d 1481 (11th Cir.1983), *vacated on other grounds,* 467 U.S. 1211, 104 S.Ct. 2651, 81 L.Ed.2d 358 (1984), *adhered to on remand,* 748 F.2d 1462 (11th Cir. 1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985). In *King,* "counsel separated himself from his client, conveying to the jury that he had reluctantly represented a defendant who had committed a reprehensible crime." 714 F.2d at 1491. In this case, counsel in no way indicated that he was being compelled to represent Julius. Moreover, counsel did not needlessly stress the brutality of the crime charged in the indictment. The remainder

they are assets to this county and assets to any organization.
Supplemental Trial Transcript at 25.

6. During argument, counsel talked to the jury about the day he received his license to practice law and a promise he made to himself on that day:
> [J]ust as long as I live and I walk into a courtroom, I'm going to make myself a vow, that I don't care who it is, I don't care if they're a convict, I don't care if they are the biggest liar that ever walked under the sun, if I, George Cameron, if I'm going to be thrown

into that courtroom with them, I'm going to do everything that I possibly can within the elements of my profession not to do anything to make a shambles of the profession that has been good to me, but at the same time, I am going to do everything that I can for that person. I don't want anybody to ever back off and say, well, that lawyer sold them down the river; that lawyer wasn't worth two cents; that lawyer just sat there; that lawyer hasn't done his job. Not against me, I hope.
Supplemental Trial Transcript at 22–23.

of his closing argument was designed to exploit weaknesses in the state's proof during the guilt phase, in an attempt to persuade the jury that any lingering doubts about Julius' guilt should result in their vote for a life sentence. Given that the verdict was based on circumstantial evidence, and given Julius' past problems with the law, such a decision was not unreasonable. We find that counsel adequately fulfilled his role as an advocate.

 Julius also argues that one of counsel's attempts to remind the jury of its duty during the penalty phase actually made it more likely that the jury would return a recommendation for the death penalty. During his closing argument, counsel stated:

Now, I'm not sure I'm asking for him at all. But let me say this, please don't do what I call getting over buck fever. They have an expression among deer hunters, that they laugh at the youngsters. They go out and the first cute, little deer they see hopping through the woods, they are so cute that they can't kill it. The next time they go, they do kill it. They they keep going and killing and killing and killing because they've done it one time. What I'm cautioning this jury about is this, you were in there six hours over that evidence. And I don't want to offend nobody [sic], but the least I can do is that in a hearing like this, I can at least tell you—and I'm not being critical—that that evidence was rotten when it was weak.

Supplemental Trial Transcript at 47–48. Julius complains that this anecdote actually advised the jurors they should give Julius the death penalty because, if they did not, he would go out and kill again. Counsel testified, however, that his intention was to remind the jury that the guilt and sentencing phases were separate portions of the trial, and that they should not feel compelled by their verdict of guilty to return a recommendation for the death penalty. While counsel's choice of anecdote might have been ill-advised, we do not believe his closing argument did "more harm than

good" as did the argument in *King*. In sum, Julius has failed to show that counsel's closing argument was sufficiently unartful to undermine our confidence in the outcome of the sentencing phase.

Finally, Julius claims counsel should have objected to the prosecutor's remarks during closing argument. Again, counsel testified that his strategy was to avoid drawing attention to the prosecutor's arguments by objecting unless an egregious error had been committed. We will rarely second guess such a strategy. In any event, we find nothing in the prosecutor's closing arguments so improper as to *require* an objection by counsel.

## III. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Julius maintains that the record before the Alabama Courts of Appeals did not contain a transcript of the juror selection proceedings. He claims that appellate counsel's [7] failure to make sure that a record of such proceedings was presented to the Alabama courts constituted ineffective assistance of appellate counsel. Since Julius has not offered any facts that would even suggest that the transcript might support a constitutional violation, he has failed to prove that his attorney's "failure" prejudiced his defense. *See Smith v. Wainwright*, 741 F.2d 1248, 1260–61 (11th Cir. 1984), *cert. denied*, 470 U.S. 1088, 105 S.Ct. 1855, 85 L.Ed.2d 151 (1985).

 Next, Julius claims counsel should have raised on direct appeal the issues he raises in this petition. On direct appeal, counsel raised two issues: (1) whether the trial court erroneously instructed the jury regarding the lesser included offense of manslaughter; and (2) whether the death sentence was unconstitutionally imposed where the same aggravating factors used during the guilt phase were used during the sentencing phase of the trial. The coram nobis court found that counsel made a tactical decision to limit his appellate brief to what he believed were his two strongest issues. Counsel is, of course, permitted to

7. Julius' appellate counsel, George Cameron, was also his trial counsel.

winnow out weaker arguments from his appellate brief. *See Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986); *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983). After reviewing the issues Julius claims should have been raised on direct appeal, we hold that counsel's failure to raise these issues was not an unreasonable tactical decision.

Julius also claims counsel should have raised a claim under *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), because the prosecutor informed the jury that the advisory verdict was subject to review by the trial court. Failure to raise this issue was not ineffective assistance, in part, because *Caldwell* had not been decided at the time of Julius' direct appeal. Moreover, we conclude that the jury was not misled by the prosecutor's remarks. The jury was repeatedly made aware of its responsibilities during the sentencing phase, and we are satisfied that the jurors understood the important role of the advisory jury.

Finally, Julius alleges that the briefs filed in the Alabama appellate courts contained inadequate legal and factual analysis of the two issues briefed. Julius claims counsel should have argued that the trial court's instruction regarding lesser included offenses violated the holding of *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). For reasons discussed in the next section, this contention is frivolous.

## IV. LESSER INCLUDED OFFENSE INSTRUCTIONS

During its guilt phase deliberations, the jury requested the court to re-define the elements of the crimes charged. In response, the court first explained that, under Alabama law, a murder is a capital murder if the state proves one of the "aggravating factors" contained in the death penalty statute. The court then listed the elements of first degree murder, second degree murder (which is first degree murder minus deliberateness and premeditation), and manslaughter (which is second degree murder minus malice). When jurors expressed some confusion as to their verdict options, the court attempted to explain the role of the aggravating factors (in this case Julius' prior conviction and life sentence) in their deliberative process. The court told the jury to decide initially whether the aggravating factors were present and then to decide whether Julius was guilty of first or second degree murder, manslaughter, or not guilty. Specifically, the court told the jury:

> It's only if you don't find any aggravating circumstances that you then have to determine whether it's murder in the first degree, murder in the second degree, manslaughter, or again, not guilty.

Trial Transcript Vol. II at 291. On direct appeal, both Alabama appellate courts held this instruction was erroneous in that it placed a condition precedent on the jury's ability to find the lesser included offense of manslaughter.[8] Both courts, however, said this error was harmless because there was no evidence to support giving an instruction on manslaughter. The court of criminal appeals pointed out the evidence showing the maliciousness of the killing and the absence of justification. 455 So.2d at 981. The Alabama Supreme Court relied on the fact that Julius' sole defense was alibi. 455 So.2d at 986.

Julius argues that the circumstances of the crime, without any supporting testimony, could have warranted a manslaughter verdict. He notes that the victim's house was found in disarray and that he received a cut below his eye. The Alabama courts disagreed, and held that Julius' failure to produce any evidence in support of a manslaughter verdict rendered the trial court's misstatement harmless.

The Alabama court's construction of Alabama law controls this issue unless that construction offends federal constitutional standards. *See Hopper v. Evans*, 456 U.S.

---

8. The instruction was correct regarding first and second degree murder. If the jury found the aggravating circumstance it was immaterial whether it was first or second degree murder. In either case, there verdict would have been that Julius was guilty of capital murder.

605, 611–612, 102 S.Ct. 2049, 2053, 72 L.Ed. 2d 367 (1982). In *Hopper,* the Court held that a defendant who admits to intentionally killing his victim is not entitled to a lesser included offense instruction, the elements of which were negated by his testimony. According to the Court, *Beck v. Alabama* requires the giving of a lesser included offense instruction only where "there was evidence which, if believed, could reasonably have led to a verdict of a lesser offense." *Id.* at 610, 102 S.Ct. at 2052. This standard is consistent with the Alabama Supreme Court's holding in this case that Julius' failure to produce any evidence warranting a charge of manslaughter in the first degree rendered the trial court's error harmless.

■ Julius attempts to distinguish *Hopper* on the ground that Julius did not testify at his trial, whereas the defendant's testimony in *Hopper* negated the possibility of conviction on the lesser included offense. Indeed, the *Hopper* court noted that "[i]n another case with different facts, a defendant might make a plausible claim that he would have employed different trial tactics—for example, that he would have introduced certain evidence or requested certain jury instructions, but for the [unavailability of a lesser included offense instruction]." *Id.* at 613 n. **, 102 S.Ct. at 2054 n. **. Nothing in *Hopper* suggests, however, that a defendant is entitled, as a matter of federal constitutional law, to a manslaughter charge when he has advanced no evidence in support of such a charge. "[D]ue process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Id.* at 611, 102 S.Ct. at 2053 (emphasis in original). Julius did not present any evidence suggesting that this crime was a manslaughter; nor did he suggest such a verdict during closing arguments; nor does he now suggest how he would have altered his defense if he had known that the jury might consider a manslaughter verdict. Under these circumstances, we will not disturb the Alabama

court's conclusion that Julius was not entitled to a manslaughter instruction. Since Julius was not entitled to an instruction, the trial court's error in giving that instruction was harmless.

■ Julius next contends that, if there was no evidence suggesting a manslaughter verdict, the giving of a manslaughter instruction violates the principles set forth in *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). In *Roberts,* the Court struck down Louisiana's mandatory death penalty statute. The Court also criticized the Louisiana rule that the jury must be instructed on all lesser included offenses "even if there is not a scintilla of evidence to support the lesser verdicts." *Id.* at 334, 96 S.Ct. at 3006. Such a system "invites the jurors to disregard their oaths and choose a verdict for a lesser offense whenever they feel the death penalty is inappropriate." *Id.* at 334, 96 S.Ct. at 3007. Although *Roberts* clearly disapproved of such a statutory scheme, we do not believe the court intended to extend to defendants a right to challenge their capital murder convictions on the ground that the jury was allowed to consider too many lesser included offenses. The jury's guilty verdict on the capital murder charge renders harmless any error made in giving the manslaughter charge.

Finally, Julius contends the challenged instruction placed a condition precedent on the jury's ability to find him not guilty. The Alabama Supreme Court found that, although the instruction was technically incorrect, the error was harmless because the jury was repeatedly instructed that it could find the defendant innocent. 455 So. 2d at 987. We are convinced, after reviewing the remainder of the court's instructions and the arguments of counsel, that the jury understood that it had the option of finding Julius not guilty even if the aggravating circumstances were present.

## V. PROCEDURAL DEFAULT

The district court concluded that Julius' six remaining claims[9] are barred from fed-

9. These are: (1) prosecutorial misconduct during closing arguments; (2) the use of the 1972

murder conviction, without a cautionary instruction, during the guilt phase; (3) the failure

eral habeas review because Julius failed to raise these issues at trial or on direct appeal. Julius concedes that he did not raise these issues at the appropriate time. He offers two reasons why the district court should have reached the merits of his defaulted claims.

First, Julius contends the Alabama courts on direct appeal implicitly reached the merits of these issues. The Alabama appellate courts are under a duty in capital cases to "notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has adversely affected a substantial right of the appellant." Ala.R.App.P. 45(a) (Alabama Court of Criminal Appeals), 39(k) (Alabama Supreme Court). In affirming Julius' conviction, the Alabama Court of Criminal Appeals stated that it had searched the record for prejudicial errors and had found none. 455 So.2d at 982. The Alabama Supreme Court made a similar finding in its opinion. 455 So.2d at 987.

According to Julius, the state courts' statements that there were no plain errors at trial indicates their belief that the issues raised in this petition are meritless. Adoption of this position would preclude a finding of procedural default in virtually every Alabama capital case. Thus, Julius' argument questions the correctness of our decision in *Magwood v. Smith*, 791 F.2d 1438 (11th Cir.1986), where we held several of petitioner's claims to be barred by procedural default. Although the "plain error" issue was not discussed in *Magwood*, we note that the state appellate court opinion in that case contained the same language Julius points to in this case. *See Magwood v. State*, 426 So.2d 918, 928 (Ala.Crim.App. 1982) ("We have searched the record for

error prejudicial to the rights of appellant and have found none."), *aff'd*, 426 So.2d 929 (Ala.), *cert. denied*, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983).

Since *Magwood* was silent about the non-effect of Alabama's plain error rule on procedural default issues, we will be explicit: the mere existence of a "plain error" rule does not preclude a finding of procedural default; moreover, the assertion by an Alabama court that it did not find any errors upon its independent review of the record does not constitute a ruling on the merits of claims not raised in that court or in any court below.[10] Unless there is some indication that the state court was aware of this issue, we cannot say that the court rejected the merits of petitioner's constitutional claim. A contrary rule would encourage the "sandbagging" of state courts criticized in *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed. 2d 594 (1977). *See Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 2647, 91 L.Ed.2d 397 (1986) (possibility of "sandbagging" exists on appeal "since appellate counsel might well conclude that the best strategy is to select a few promising claims for airing on appeal, while reserving others for federal habeas review should the appeal be unsuccessful."). Accordingly, we reject Julius' argument.

Second, Julius contends that the ineffectiveness of his trial and appellate counsel in failing to timely raise these issues in the state courts constitutes "cause" for his procedural default. *See Murray*, 477 U.S. at 488, 106 S.Ct. at 2645–46. Our disposition of Julius' claims of ineffective assistance of counsel earlier in this opinion resolves this issue. Since counsel's failure to raise these issues did not rise to the level of a Sixth Amendment violation, such fail-

to include a transcript of the jury qualification proceeding in the Alabama appellate court record; (4) the use of the transcript from his prior trial during the guilt phase without a proper explanatory instruction; (5) the use, as an aggravating circumstance, of the 1972 murder conviction obtained pursuant to an unconstitutional death penalty statute; and (6) retrial under a judicially rewritten death penalty statute.

10. This rule is limited to the facts of this case. We express no opinion as to the effect of such a statement when the allegedly barred issue was raised by the defendant but not discussed in the state court's opinion. Nor need we decide whether such language permits federal review where the defendant raised the claim at trial, thus making it more likely that the state appellate court came across the claim during its review of the record.

ure cannot constitute cause for the procedural default. *Id.* Since Julius offers no other excuse for the default, we affirm the district court's decision to avoid reviewing the merits of these claims.

## CONCLUSION

For the foregoing reasons, the judgment of the district court denying Julius' petition for writ of habeas corpus is AFFIRMED.