**Gary BURRIS, Petitioner,**

v.

**Robert A. FARLEY, Respondent.**

**No. 3:92cv0755 AS.**

United States District Court,
N.D. Indiana,
South Bend Division.

Jan. 27, 1994.

**640**

David E. Vandercoy, Valparaiso, IN, for petitioner.

Wayne Uhl, Indianapolis, IN, for respondent.

### MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

#### I.

On December 9, 1992, the petitioner, Gary Burris, filed a petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On March 19, 1993, the respondent through the Attorney General of Indiana filed a "Response to Order to Show Cause." On June 30, 1993, the petitioner filed a "Memorandum in Support of Habeas Petition." Next, on September 3, 1993, the respondent filed a "Supplemental Memorandum and Reply to Petitioner's Memorandum in Support of Amended Habeas Petition." On September 27, the petitioner filed a "Reply Brief." The relevant state court record has been filed and examined pursuant to the mandates of *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). In addition, this court held proceedings in Lafayette, Indiana, on September 7, 1993.

On January 29, 1980, the body of Kenneth W. Chambers was found dead in an alley in the 3200 block of East Fallcreek Parkway in Indianapolis, Indiana. The petitioner, Gary Burris, was charged with murder; and on December 4, 1980, a jury in the Marion Superior Court Criminal Division found him guilty. The state trial court imposed the death penalty on February 20, 1981.

The petitioner appealed to the Supreme Court of Indiana, and that Court affirmed the petitioner's conviction in an extensive opinion dealing with 11 major issues. *See Burris v. State,* 465 N.E.2d 171 (Ind.1984), *cert. denied,* 469 U.S. 1132, 105 S.Ct. 816, 83 L.Ed.2d 809 (1985) (*"Burris I "*). This court notes that all of the Justices on the Supreme Court of Indiana concurred in this 23–page opinion. The petitioner also filed for certiorari to the United States Supreme Court. The Supreme Court refused to grant certiorari.[1] *Id.*

Next, the petitioner pursued the available remedies outlined in the Indiana post-conviction rules. The post-conviction court denied the motion. The petitioner appealed the denial of the post-conviction motion to the Supreme Court of Indiana. *See Burris v. State,* 558 N.E.2d 1067 (Ind.1990) (*"Burris II "*). In *Burris II,* the Indiana Supreme Court, in a majority opinion authored by Chief Justice Shepard, and concurred in by Justices De-Bruler, Dickson, Givan, and Pivarnik ordered the state trial court to hold a new penalty phase proceeding.[2]

---

1. This court notes that the petitioner was represented by counsel, in fact two experienced counsel, in his trial. And yet another counsel on his direct appeal.

2. In the post-conviction action, the petitioner was represented by counsel. On appeal from the denial of the post-conviction action, the petitioner was again represented by counsel, in that case

At the hearing on September 7, 1993, the Attorney General reiterated that pursuant to the direction of the Indiana Supreme Court in *Burris II, supra*, the petitioner was entitled to a new penalty phase proceeding. In addition, the Attorney General indicated that such a proceeding was held, and that the petitioner again received the death penalty. The petitioner has appealed this action to the Indiana Supreme Court, and as of the date of this opinion, that action is still pending. There is a strong possibility that this petitioner may file another habeas petition based on any constitutional errors that may have occurred during the most recent penalty proceeding. *See, e.g., Schiro v. Clark*, 754 F.Supp. 646 (N.D.Ind.1990), *aff'd*, 963 F.2d 962 (7th Cir.1992), *aff'd*, — U.S. —, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994). At the hearing on the petition for habeas corpus, the Attorney General waived any arguments based on the doctrine of the exhaustion of state remedies. Therefore, this court will not consider the ramifications of this issue. Thus, this case and proceeding under 28 U.S.C. § 2254 relates only to the guilt phase of the trial conducted before the late John Tranberg as a Judge of the Marion Superior Court Criminal Division.

In pursuing a writ of habeas corpus on the basis of any constitutional errors at the guilt/innocence phase, the petitioner makes several claims. First, the petitioner claims that a jury instruction given at the conclusion of the guilt phase was improper and violated his due process rights. In addition, the petitioner asserts several claims based on prosecutorial misconduct. Next, the petitioner asserts a claim based on the content of the indictment. Finally, the petitioner also lists a plethora of allegations, and specifically asserts each scenario as a violation of his Sixth Amendment right to effective counsel.

## II.

The petitioner's first claim is based on the jury instructions. This court notes that at the conclusion of the guilt/innocence phase of the trial, the state trial court judge gave the following jury instruction defining the crime at issue in the trial in the following fashion:

Linda Wagoner, who this court knows to be a

A part of the Statute of the State of Indiana which defines and states the essential elements of the crime of Murder, with which the defendant is charged in the Information, reads as follows:

"A person who kills another human being while committing or attempting to commit ... robbery; commits murder, a felony."

Robbery, as that term is used in the above statute, is defined as follows:

"A person who knowingly or intentionally takes property from another person or from the presence of another person:

(1) by using or threatening the use of force on any person; or

(2) by putting any person in fear; commits robbery...."

*See* Final Jury Instruction 23.

The other requisites to the petitioner's claim are the statutory definitions of murder, involuntary manslaughter, and robbery. This court notes that murder in the Indiana criminal code is defined in the following fashion:

Murder

Sec. 1. A person who:

(1) knowingly or intentionally kills another human being; or

(2) kills another human being while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery;

commits murder, a felony.

*See Ind. Code* § 35–42–1–1.

Involuntary manslaughter is defined as:

Involuntary Manslaughter

Sec. 4. A person who kills another human being while committing or attempting to commit:

(1) A Class C or Class D felony that inherently poses a risk of serious bodily injury;

(2) A Class A misdemeanor that inherently poses a risk of serious bodily injury; or

highly competent criminal defense lawyer.

(3) battery;

commits involuntary manslaughter, a Class C felony. However, if the killing results from the operation of a vehicle, the offense is a Class D felony.

*See Ind.Code* § 35–42–1–4.

Finally, robbery is defined as:

Robbery

Sec. 1. A person who knowingly or intentionally takes property from another person or from the presence of another person:

(1) by using or threatening the use of force on any person; or

(2) by putting any person in fear;

commits robbery, a Class C felony. However, the offense is a Class B felony if it is committed while armed with a deadly weapon and a Class A felony if it results in either bodily injury or serious bodily injury to any other person.

*See Ind.Code* § 35–42–5–1.

The gist of the petitioner's due process claim is that the judge based the jury instruction for purposes of felony murder on Class C robbery. The petitioner asserts that "[t]he robbery statute defined three (3) different crimes: 1) simple robbery graded as a Class C felony; 2) Class B robbery which required the presence of an additional element, committing robbery while armed with a deadly weapon; and 3) if a different, additional element was present, i.e., bodily injury, the crime was Class A robbery." *See Petitioner's Memorandum.* Therefore, in light of the abovementioned jury instruction, the petitioner asserts that "[t]he charge expressly advised the jury that simple robbery, a Class C felony, would support a felony murder conviction." *Id.* This court notes that a reading of the felony murder statute suggests no impropriety in such a construction; however, the petitioner asserts that "by statutory definition, a killing which occurs during the commission of a Class C felony which inherently poses a risk of serious bodily injury constitutes involuntary manslaughter." *Id.* A reading of the involuntary manslaughter statute in that fashion is also plausible. Therefore, argues the petitioner, insofar as "[r]obbery obviously poses an inherent risk of serious bodily injury ... a killing which occurs during the course of a Class C robbery constitutes involuntary manslaughter." *Id.* In so doing, the petitioner also asserts that the abovementioned statutes as reflected by the jury instructions are ambiguous.

This court notes that the petitioner's counsel failed to object to the jury instructions during the trial and also failed to include this issue on direct appeal to the Indiana Supreme Court. In post-conviction proceedings, the petitioner "argued that Class C robbery will not support a felony murder charge and asserted that the required predicate must be Class A robbery, robbery which results in bodily injury." *Id.* On this issue, the post-conviction court indicated that this issue has been waived because the petitioner failed to raise the issue on direct appeal. The petitioner appealed and the Indiana Supreme Court agreed with the post-conviction court that the issue had been waived. *Burris II,* 558 N.E.2d at 1077. *See also Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Ylst v. Nunnemaker,* 501 U.S. 797, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

■ The petitioner concedes that this court is barred from considering this issue insofar as there is a procedural default bar.[3] Furthermore, the petitioner also concedes that to assert a claim that has been procedurally defaulted, there must be a showing of cause and prejudice.[4] On this issue, this court notes that it is axiomatic that "a federal habeas petitioner who failed to comply with state procedural rules must show cause for the procedural default and prejudice attributable thereto in order to obtain review of his

---

**3.** In the Reply Brief, the petitioner retracts their concession on the issue of procedural default, and in so doing, argues that the Supreme Court opinion in *Harris, supra* is dispositive on this issue. This court need not evaluate this in light of the decision outlined in section II of this opinion.

**4.** The petitioner can also argue that there is a miscarriage of justice to supplant the procedural default bar. *See Mills v. Jordan,* 979 F.2d 1273 (7th Cir.1992).

defaulted constitutional claim." *Madyun v. Young*, 852 F.2d 1029, 1032 (7th Cir.1988) (citing *Murray v. Carrier*, 477 U.S. 478, 486, 106 S.Ct. 2639, 2644, 91 L.Ed.2d 397 (1986)). In fact, in *Coleman v. Thompson*, 501 U.S. 722, ——, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991), the Court, speaking through Justice O'Connor, made clear that the cause and prejudice test applies to all state procedural defaults:

> We now make it explicit: In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.*

■ In asserting cause for purposes of the cause and prejudice test, the petitioner argues ineffective assistance of counsel at trial. The specific test in an ineffective assistance of counsel claim mandates a two part evaluation. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A petitioner must illustrate that counsel's performance fell below an objective standard of reasonableness. First, a petitioner must specify the particular acts or omissions precipitating the respective claim. To evaluate the performance, the *Strickland* court explained that a court "must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. After specifying the particular acts or omissions, a petitioner must then explain how counsel's failure to meet the requisite standard of performance caused actual prejudice to the petitioner's case. *See Sullivan v. Fairman*, 819 F.2d 1382, 1390 (7th Cir.1987).

■ With all due respect to the petitioner, this ineffective assistance of counsel claim goes beyond the jury instructions to the very posture of the case beginning with the indictment. The petitioner was indicted on murder and the theory of the prosecution was based on the felony-murder doctrine with robbery as the predicate felony. It is possible to suggest that trial counsel could pursue a theory of defense based on the abovementioned involuntary manslaughter analysis, but this was not done. Such a course of action certainly does not constitute ineffective assistance of counsel. More importantly, to suggest that trial counsel should have been arguing a theory based on an ambiguity in the criminal statutory scheme rather than preparing the intricate details of a murder trial is not fathomable. It is possible that trial counsel could have attacked the indictment on this theory; however, there is no question that the benefit of making an argument of this nature would *not* outweigh the opportunity costs attributed to such an exercise. The opportunity costs at the pretrial stage can be phenomenal and any time not dedicated to the nuts and bolts of preparing for a murder trial would be ill-advised. Therefore, this court finds that the failure to pursue an argument similar to that which is propagated here is not a Sixth Amendment violation.[5]

■ Prejudice for purposes of the procedural default cause and prejudice test and for purposes of the *Strickland* prejudice prong are the same. *See Erwin Chemerinsky, Federal Jurisdiction* at 710–12; *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). However, this court need not discuss prejudice in light of the finding on the first part of the *Strickland* test.

This court is not entirely comfortable deciding this issue on procedural default. Therefore, this court will also consider whether the abovementioned jury instruction

---

5. Additionally, on the issue of whether counsel's performance was reasonable, this court notes that in *United States v. Stodola*, 953 F.2d 266 (7th Cir.1992), the Seventh Circuit evaluated a claim of this nature. In *Stodola*, the court analyzed whether "trial counsel's failure to object to the

instructions constitutes ineffective assistance under *Strickland....*" *Id.* at 273 n. 6. The court indicated that "[s]ince the instruction given by the district court comported with the law of this circuit, trial counsel's failure to object was not ineffective assistance of counsel." *Id.*

constitutes a violation of the Due Process Clause of the U.S. Constitution.

On this issue, the petitioner points to *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970), and *United States v. Frady*, 456 U.S. 152, 169, 102 S.Ct. 1584, 1595, 71 L.Ed.2d 816 (1982), as the constitutional authority for this claim. In *In re Winship, supra*, the Supreme Court held "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.*, 397 U.S. at 364, 90 S.Ct. at 1073. The petitioner also contends that "where the error is so fundamental as not to submit to the jury essential ingredients of the only offense on which the conviction could rest, we think it necessary for us to take note of it on our own motion." *Screws v. United States*, 325 U.S. 91, 107, 65 S.Ct. 1031, 1038, 89 L.Ed. 1495 (1945) (plurality opinion). *See also Francis v. Franklin*, 471 U.S. 307, 313, 105 S.Ct. 1965, 1970, 85 L.Ed.2d 344 (1985).

The Attorney General of Indiana asserts that the state trial court jury instructions are within the purview of state law and only involve federal constitutional issues under very limited circumstances. In so doing, the Attorney General argues that "[u]nless [the petitioner] can show that Indiana's courts have interpreted its felony murder statute to include robbery only in its aggravated forms, [then the petitioner] cannot claim that the trial court's instruction on felony murder omitted essential elements of that offense." *See Respondent's Memorandum.* The Attorney General contends that this issue was recently decided in *Averhart v. State*, 614

N.E.2d 924, 934–35 (Ind.1993). On this issue, the Attorney General also argues that in *Bates v. McCaughtry*, 934 F.2d 99 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 318, 116 L.Ed.2d 260 (1991), the Seventh Circuit indicated that "state court determinations of elements of offense are binding on federal habeas court[s]." *Id.*[6]

The mix of habeas corpus, due process, and jury instructions can be exceedingly complex. Although the petitioner's aim with the due process claim is the abovementioned jury instruction, this due process issue functions at two levels. The first charges that the Indiana criminal statutory scheme *on its face* constitutes a due process violation insofar as the construction of the murder, involuntary manslaughter, and robbery statutes leads to ambiguity. The second charges that the murder statute *as applied* against the petitioner here is a due process violation.

 In order to resolve the issue of whether the Indiana criminal statutory scheme is facially invalid, this court notes that in "interpreting an ambiguous statute the court will seek to find the intention of the legislature." *Wayne LaFave & Austin Scott, Jr, Substantive Criminal Law*, § 2.2 *Interpretation of Criminal Statutes* at 104. The legislative intent of the statute clearly illustrates that the crime of robbery was purposely included in the felony murder statute to effectuate the policy behind the felony-murder rule.[7]

This court notes that on the Bicentennial year of our Nation, the State of Indiana "finally joined the growing number of states that have recently revised and modernized their criminal codes." *See William Kerr*,

---

**6.** The Attorney General also argues that the petitioner's statutory argument is flawed for several reasons. First, the Attorney General argues that "[the petitioner] incorrectly [argues] that the same conduct cannot be the subject of two statutorily defined offenses." To dispel this assertion, the Attorney General maintains that "death caused by drunk driving, punishable in Indiana either as reckless homicide or operating [a motor vehicle] while intoxicated and causing death" contradicts this notion. *See, e.g., Marshall v. State*, 563 N.E.2d 1341 (Ind.App.1990).

**7.** In *Eddy v. State*, 496 N.E.2d 24 (Ind.1986), the Indiana Supreme Court indicated that the "felo-

ny murder statute must be construed in light of its purpose." *Id.* In so doing, the *Eddy* court pointed to a decision in *Bissot v. State* (1876), 53 Ind. 408. In *Bissot*, the court explained:

> If [a technical] construction were to be given to the statute, it would be quite impracticable to ever convict for a murder committed in the perpetration of any of the felonies mentioned in this section. The intention of the legislature, in enacting the section, was, doubtless, to class certain homicides in the highest degree of murder without containing the ingredient of premedication, malice, or intention....

*Id.* at 412.

*Foreword: Indiana's Bicentennial Criminal Code,* 10 *Indiana Law Review* 1 (1976). "The project began in ... 1970 when the Indiana Criminal Law Study Commission was created, and it continued for the next six years as the commission prepared first a proposed procedural code and then a new substantive code." *Id.*

In revising the code, the General Assembly "organiz[ed] and group[ed] ... related offenses and the classification of offenses according to the seriousness of each offense...." *Id.* at 13. "Homicide ... one of the most serious crimes ... is placed at the beginning of the code [and] ... grouped with other offenses against the person." *Id.* In addition, "the full range of felony classifications is reflected in its various provisions, ranging from a Class A to a Class D felony and including the capital felony category." *Id.* "The major change ... is the elimination of the distinction between first and second degrees murder." *Id.* "First degree murder has previously been defined as the killing of a human being purposely and with premeditated malice whereas second degree murder was the killing of a human being purposely and maliciously but without premeditation." *Id.* "Under the new code, the two degrees of murder are abolished and murder is defined simply as the knowing or intentional killing of a human being." *Id.* *"The murder definition also continue to include the felony-murder rule from the prior law [and] adds kidnapping and unlawful sexual deviate conduct to the prior list of arson, burglary, rape, and robbery." Id.* (emphasis provided)

The General Assembly also revised the involuntary manslaughter statute. "The gist of the offense under the prior definition was the involuntary or unintentional killing of a human being during the commission of an unlawful act." *Id.* More importantly, according to the author, Professor Kerr, the newly defined involuntary manslaughter statute "refer[ed] merely to a killing during an 'offense' without defining the type or nature of the offense that is required for the involuntary manslaughter." *Id.* In addition, the author points out that robbery was also redefined and "[a]dditional penalties are pre-

scribed in the new code, based on the existence of aggravating circumstances...." *Id.*

"The code was originally enacted during the 1976 session of the General Assembly, but its effective date was delayed until July 1, 1977, to permit further study of the code's provisions." *See William Kerr, Foreward: Indiana's New and Revised Criminal Code,* 11 *Indiana Law Review* 1. "A Criminal Code Interim Study Commission was then established to review the code and to make recommendations for changes by the General Assembly." *Id.* "[T]he 1977 General Assembly accepted a recommendation to classify murder as a separate offense, *sui generis* [, and] "[a]s a result, the code now includes five felony classifications, including murder and Class A through Class D felonies." *Id.*

In addition, the General Assembly had to resolve two remaining problems in the involuntary manslaughter statute. Specifically, "[t]he new definitions apparently expanded the former offense of involuntary manslaughter to include both intentional and unintentional killings during the commission of any offense, but the definitions still presented two difficult issues." *Id.* "The first issue is whether the related offense is independent of or a lesser included offense of involuntary manslaughter." *Id.* "The second issue is whether the term 'offense' includes any and all misdemeanors and felonies or whether it is limited, such as to acts that are dangerous to life or are *mala in se."*

"In an effort to resolve both of th[is] issue, the 1977 General Assembly amended the definition of involuntary manslaughter in the new code and inserted a specific list of offenses that could give rise to a charge of involuntary manslaughter." *Id.* at 11. "The first issue was ... resolved by limiting the related offenses to Class C felonies or to offenses of a less serious classification." *Id.* "Since involuntary manslaughter is a Class C felony, except when a vehicle is involved, there is thus no issue concerning proportionality even if the related offense is considered to be a lesser included offense of involuntary manslaughter." *Id.* "The other issue was resolved by limiting the offense to those that inherently pose a risk of serious bodily injury...." *Id.*

■ The legislative history behind the Indiana criminal statutory scheme is not so ambiguous to constitute a due process violation. The felony murder doctrine evolved from the "English common law felony-murder rule ... that one who, in the commission or attempted commission of a felony, caused another's death, was guilty of murder, without regard to the dangerous nature of the felony involved or to the likelihood that death might result from the defendant's manner of committing or attempting the felony." *See Wayne LaFave & Austin Scott, Jr, Substantive Criminal Law*, § 7.5 *Crimes Against the Person* at 206. "[A]s the number of felonies multiplied so as to include a great number of relatively minor offenses ..., it became necessary ... to limit the [rule] in some fashion." *Id.* "In many states, the felony-murder rule has been limited in scope, and undoubtedly, the Indiana General Assembly intended to limit felony murder to include those felonies" which were felonies at common law [which includes robbery.] *Id.* at 208. This court also notes that "most modern felony murder statutes limit the crime to a list of specific felonies—usually rape, robbery, kidnapping, arson and burglary—which involve a significant prospect of violence." *Id.* at 211. It is clear that such was the intent of the Indiana General Assembly.

■ It should also be noted that murder is a specific intent crime requiring the specific intent to kill often termed "malice aforethought." *Id.* § 7.1 *Murder* at 181. Courts have developed certain forms of implied "malice aforethought" including "intent-to-do-serious-bodily-injury murder," "depraved-heart murder," and the "felony-murder doctrine." *Id.* Manslaughter "is an intermediate crime which lies half-way between the more serious crime of murder, at the one extreme, and, at the other extreme, justifiable or excusable homicide...." *Id.* § 7.9 *Manslaughter* at 251. "[M]anslaughter itself was subdivided into two branches— voluntary manslaughter (intended homicide in a heat of passion upon adequate provocation) and involuntary manslaughter (unintended homicide under certain circumstances ...). *Id.* The Indiana involuntary manslaughter statute is comparable to the "unlawful act" manslaughter. " 'Unlawful act' is

a phrase ... which ... includes" both misdemeanors and felonies "which for some reason will not suffice for felony-murder...." *Id.* § 7.13 *Unlawful Act Involuntary Manslaughter* at 288 (citing the Indiana Criminal Code 35–42–1–4).

In light of the foregoing, this court finds that there is no ambiguity in the criminal statutes.

■ Next, on the issue of whether the specific application of this statute to the petitioner is unconstitutional, this court notes that the due process machinations are best illustrated as a linear continuum beginning in state law and progressing into constitutional due process considerations. It is impossible to delve into the due process protections applicable to jury instructions without wading into state law; however, a federal court may not tackle state law issues under 28 U.S.C. § 2254. Oftentimes, it is difficult to distinguish between the two and oftentimes the two are inextricably intertwined.

This court notes that the Constitutional limitations visited upon jury instructions by the due process clause usually relate to "legislative attempts to relieve the prosecution from the burden of proving some fact which is often difficult to establish." *See Wayne LaFave & Austin Scott, Jr., Substantive Criminal Law, Constitutional Limitations– Due Process and Statutory Presumptions, Defenses, and Exceptions. See also Nelson Roth & Scott Sundby, The Felony–Murder Rule: A Doctrine at Constitutional Crossroads*, 70 *Cornell Law Review* 446 (March 1985). A plethora of due process decisions relate to jury instructions that invoke the use of presumptions, inferences, or "mandatory rebuttable presumptions." *Id. See Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *Suniga v. Bunnell*, 998 F.2d 664 (9th Cir.1993). Another species of due process decisions relate to jury instructions that relate to affirmative defenses. *See Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977); *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). There is a certain

amount of complexity in these claims, and there are several recent Seventh Circuit cases that illustrate this assertion. *See Falconer v. Lane*, 905 F.2d 1129 (7th Cir.1990) (evaluating the due process ramifications of Illinois' murder and voluntary manslaughter instructions in light of the order in which the instructions were given and the burden-shifting content of the instructions); *Rose v. Lane* 910 F.2d 400 (7th Cir.), *cert. denied*, 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 526 (1990); *United States ex rel. Fleming v. Huch*, 924 F.2d 679 (7th Cir.1991); *United States ex rel. Flowers v. Illinois Department of Corrections*, 5 F.3d 1021 (7th Cir.1993).

█ This court must ascertain whether the statute dictates the use of any presumptions, inferences, "mandatory rebuttable presumptions," or affirmative defenses. In evaluating whether any of the abovementioned axioms are at issue in the jury instruction at issue here, state law plays an integral role in the due process claim. This court finds that the requisite elements for felony-murder based on robbery do not include any presumptions, inferences, rebuttable presumptions, or affirmative defenses. In addition, it is clear to this court that the legislative history on the statutes involved in this due process claim do not mandate the use of any presumptions, inferences, or "mandatory rebuttable presumptions," or affirmative defenses.

█ That is not the end of the due process analysis. In order to assert a viable due process violation based on a jury instruction issue, the petitioner must also establish that "the instruction is undesirable, erroneous, or ... 'universally condemned,' [and] that it violated some right" protected by the Fourteenth Amendment. *Cupp v. Naughten*, 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). More importantly, and certainly dispositive to the petitioner's claim here, is the second part of the due process analysis. The second part was very cogently explained by Justice O'Connor in *United States v. Frady*, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982):

Recently, for example, Justice Stevens, in his opinion without dissent in *Henderson v. Kibbe*, [431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203] [ (1977) ] summarized the degree of prejudice we have required a prisoner to show before obtaining collateral relief for errors in the jury charge as " 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.' " 431 U.S., at 154, 97 S.Ct., at 1736 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)). We reaffirm this formulation, which requires that the degree of prejudice resulting from instruction error be evaluated in the total context of the events at trial. As we have often emphasized: "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten, supra*, at 146–147, 94 S.Ct., at 400 (citations omitted). Moreover, "a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction." *Id*, at 147, 94 S.Ct., at 400.

*Id.*

█ In ascertaining the propriety of the jury instructions in light of the aforementioned authorities, this court finds that the petitioner's due process claim must fail under the abovementioned due process test.[8]

---

8. In *United States ex rel. Jenkins v. Godinez*, 1993 WL 98248, 993 U.S. Dist. LEXIS 4161 (N.D.Ill. 1993), Judge Williams discussed the due process machinations on a similar issue. Specifically, in *Godinez*, Judge Williams considered whether the petitioner's claim "that the non-IPI jury instructions for felony murder should not have been substituted for the IPI instructions which adequately defined the elements of felony murder." *Id.* The court explained that:

The IPI instruction on felony murder is:

A person commits the offense of murder when he kills an individual without lawful justification if, in performing the acts which cause the

 Absent a due process violation, this claim represents a dispute over the basic elements of the statute. On this issue, it is clear to this court that the definitions and elements of the Indiana criminal code are *strictly* a matter of state law. A matter of state law is not within the purview of this court's habeas jurisdiction. *See Stephens v. Miller*, 13 F.3d 998 (7th Cir.1994) [9] Errors of state law are also not within the purview of this court's § 2254 jurisdiction.[10] Al-

> death, ... he is committing [aggravated battery].
>
> IPI Criminal No. 7.01.

The instruction for felony murder given in this case states that:

> "[A] person commits the offense of murder when he commits a forcible felony and an individual is killed during the course of the commission of that forcible felony."

*Id.* (citing *People v. Jenkins*, 190 Ill.App.3d 115, 137 Ill.Dec. 225, 234, 545 N.E.2d 986, 995 (1989)). ... The petitioner "contends that the non-IPI instruction erroneously defined the elements of felony murder by omitting the causation element.

In considering this issue, Judge Williams explained:

> Jury instructions in state trials are matters of state law and procedure that do not involve federal constitutional issues. *United States ex rel. Waters v. Bensinger*, 507 F.2d 103, 105 (7th Cir. 1975). Before this court can overturn a conviction resulting from an erroneous instruction given by a state trial court, "it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right" guaranteed by the Fourteenth Amendment. *Cupp v. Naughten*, 414 U.S. 141, 146 [94 S.Ct. 396, 400, 38 L.Ed.2d 368] (1973). Further, the inadequate instruction by itself must so infect "the entire trial that the resulting conviction violates due process." *Id.* at 147 [94 S.Ct. at 400].

> Although IPI instruction 7.01 accurately tracts the felony murder statute, the non-IPI instruction given here adequately reflects Illinois courts' interpretation of this statute.... [T]he non-IPI instruction did not omit the causation element for felony murder, and there was no due process violation. Since the non-IPI instruction did not rise to the level of a constitutional violation, [the petitioner] is not entitled to habeas relief.

> Furthermore, ... [the petitioner] has not met the high burden of demonstrating that the instruction was so prejudicial that habeas relief is warranted. In short, "the burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 [97 S.Ct. 1730, 1736, 52 L.Ed.2d 203] (1977). In *Henderson*, the Court determined that the omission of more complete jury instructions—beyond the reading of the statute itself—on the causation issue of second degree murder was not so prejudicial as to violate due process. *Id.* at 155–157 [97 S.Ct. at 1737–1738]. In addition, the Court explained that it was unwilling to speculate that the jury would have reached a different verdict with an additional instruction on causation. *Id.* at 157 [97 S.Ct. at 1738].

> Similarly, this court is unwilling to speculate that the jury would have reached a different verdict if the IPI instruction on felony murder had been given. Since the non-IPI instruction adequately described the felony murder rule under Illinois law, and nothing in Jenkins' argument or our review of the record indicates otherwise, there is no reasonable probability that the outcome of the trial would have been different.

*Id.*

9. This court notes that the writ of habeas corpus is only intended to address violations of the U.S. Constitution, or the laws or treaties of the United States. Violations of state law alone are not viable and cannot be addressed pursuant to the writ of habeas corpus. The Supreme Court in *Estelle v. McGuire*, —— U.S. ——, ——, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991), explained this very succinctly:

> [I]nquiries into decisions based on state law, such as an evidentiary ruling are not a part of a federal court's habeas review of a state conviction. We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.' *Lewis v. Jeffers*, 497 U.S. [764], [780], 110 S.Ct. 3092, 3102 [111 L.Ed.2d 606] (1990); *see also Pulley v. Harris*, 465 U.S. 37, 41 [104 S.Ct. 871, 874, 79 L.Ed.2d 29] (1984). Today, we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 [96 S.Ct. 175, 177, 46 L.Ed.2d 162] (1975) (*per curiam*).

*Id.*, —— U.S. at ——, 112 S.Ct. at 480.

10. When any of the abovementioned scenarios are at issue, due process and state law become inextricably intermixed. In *Taylor v. Gilmore*, 954 F.2d 441 (7th Cir.1992), the Seventh Circuit, speaking through Judge Flaum, illustrated how such claims become enmeshed and then cogently explained how to unravel the due process analysis. In *Taylor*, in seeking a writ of habeas corpus, the petitioner maintained that his murder

though this court notes that the line between what is a matter of state law as reflected by the jury instructions and what is a due process violation requires succinct evaluation. Here, state law determines what the elements of state law are, but, due process dictates that the jury instructions must adequately reflect that state law.

 In this habeas petition, the jury instruction claim only relates to a dispute over how the Indiana criminal statutes are applied in the Indiana criminal courts. A state claim cloaked in due process appears untenable in light of the abovementioned discussion. On this issue, it is clear this court must look to state law, and state law indicates that felony murder can be based on robbery. All of the elements stemming from the criminal code were included in the jury instructions. This application and construction of the abovementioned statutes are congruent with numerous decisions from the state courts of Indiana. Specifically, this court notes that the pronouncements of the Indiana Supreme Court on this issue in *Averhart v. State, supra,* are very persuasive. In *Averhart,* the defendant-appellant claimed that "the post-conviction court was in error in rejecting his claim that there was error in the instructions on the charge of felony murder." *Id.* Specifically, the defendant-appellant claimed that "the instructions were erroneous in that they did not require the State to prove a class A

felony robbery." *Id.* On this issue, the Indiana Supreme Court in *Averhart* explained:

> With respect to this claim, the post-conviction court found:
>
>> That the trial court properly instructed the jury on the elements of the offense of Felony–Murder, including the underlying felony of Robbery, under I.C. 35–42–1–1 and I.C. 35–42–5–1.
>>
>> That the trial court instructed the jury that in considering any single instruction the jury should consider it with all other instructions given.
>>
>> That trial counsel for the Petitioner failed to object to any of the instructions given to the jury at the conclusion of the case.

Post–Conviction Record at 1227. The felony murder charge alleged that appellant shot and killed George Yaros while engaged in the process of taking money from David Reba through the use or threat of use of force. This charge does not specifically allege the statutory aggravating factors required for the class A felony of robbery. The felony murder statute requires that the death of another result during the commission of the felony of robbery. Robbery is defined at Ind.Code 35–42–5–1. There is no basis in this charge, the felony murder statute, or rea-

"conviction was invalid because the instructions given the jury were defective, precluding it from returning a voluntary manslaughter verdict when one may have been appropriate." *Id.* at 442. At the time of the petitioner's criminal trial, the state of Illinois invoked the use of a "mitigating mental state" to demarcate murder and voluntary manslaughter. "In essence, the [mitigating mental state] worked as a partial affirmative defense to a charge of murder—partial in that a successful defense effected a murder acquittal but a manslaughter conviction." *Id.* At trial, the petitioner invoked the mitigating mental state and "maintained that he acted under a sudden and intense passion ... and was guilty of voluntary manslaughter." *Id.* at 444. The trial court judge issued the necessary uniform jury instructions for both murder and voluntary manslaughter. Simple enough until the uniform jury instructions were declared defective under Illinois law by the Illinois Supreme Court.

After exhausting his state remedies, the petitioner filed for a writ of habeas corpus. The *Taylor* court explained that "[t]he Illinois Su-

preme Court in [*People v.*] *Reddick* [123 Ill.2d 184, 122 Ill.Dec. 1, 526 N.E.2d 141] [(1988)] invalidated jury instructions identical in all relevant aspects to those tendered at [the petitioner's] trial." *Id.* at 448. In addition, the *Taylor* court indicated that the "central issue in *Reddick* was whether, in a homicide case, the defendant or the prosecution bears the burden of proving whether the defendant had a mitigating mental state when the killing occurred." *Id.* In *Reddick,* "the Court declared the jury instructions defective because they placed upon the defendant the burden of proving the existence of a mitigating mental state." *Id.* In describing the Illinois Supreme Court decision further, the *Taylor* court explained that the *Reddick* decision was based entirely on "the Illinois Criminal Code." *Id.* The *Taylor* court explained that insofar as the rule in *Reddick* "was grounded solely on Illinois criminal law, and we are foreclosed from granting habeas corpus relief because a state committed an error of state law." *Id.* (citing *Estelle v. McGuire,* ── U.S. ──, ──, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991); *Pulley v. Harris,* 465

son itself, to condemn the court's instructions.

*Id.* at 934–35.

Here, the use of the due process clause premised on jury instructions is to use due process "as a back door to review questions of substantive law." *Bates v. McCaughtry,* 934 F.2d 99 (7th Cir.1991).[11] In *Bates,* the petitioner asserted that his state criminal conviction was unconstitutional because the state misapplied state law; and therefore, violated the pronouncements of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). On this issue, the Seventh Circuit, speaking through Judge Easterbrook, explained that "*Jackson [v. Virginia, supra]* prevents the state from evading the burden of persuasion established by the due process clause of the fourteenth amendment." *Id.* (citing *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)); *see also Jones v. Thieret,* 846 F.2d 457 (7th Cir.1988).

In explaining that the petitioner "cannot obtain a second opinion on the meaning of state law through the maneuver of making a claim under *Jackson,*" the *Bates* court explained:

> *Jackson* establishes that states must act on the basis of sufficient evidence. The principle seems unproblematic: it is barbaric to imprison persons who no reasonable juror could think had committed a crime. Implementing *Jackson* is not so easy as stating its principle, however. Judgments represent the application of law to fact. Evidence can be "insufficient" only in relation to a rule of law requiring more or different evidence. When a state court enters or affirms a conviction, it is saying that the evidence satisfies the legal norms. These norms are for the state to select. State law means what state courts say it means. *See, e.g., Garner v. Louisiana,* 368

U.S. 37, 41, 104 S.Ct. 871, 874, 79 L.Ed.2d 29 (1984)).

11. The nature of habeas corpus allows federal courts to consider issues of this nature in a vacuum of the state record and the caselaw of federal habeas corpus. However, this court is compelled to point out that this petitioner was charged with felony-murder, prosecuted for felo-

U.S. 157, 166, 7 L.Ed.2d 207, 82 S.Ct. 248 [253] (1961) ("We of course are bound by a State's interpretation of its own statute and will not substitute our judgment for that of the State's when it becomes necessary to analyze the evidence for the purpose of determining whether that evidence supports the findings of a state court."); *Hebert v. Louisiana,* 272 U.S. 312, 316–17, 71 L.Ed. 270, 47 S.Ct. 103 [104] (1926); *Patterson v. Colorado,* 205 U.S. 454, 459–61, 51 L.Ed. 879, 27 S.Ct. 556 [556–58] (1907). A claim that the state court misunderstood the substantive requirements of state law does not present a claim under @ 2254. "A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris,* 465 U.S. 37, 41, 79 L.Ed.2d 29, 104 S.Ct. 871 [875] (1984). *See also, e.g., Smith v. Phillips,* 455 U.S. 209, 221, 71 L.Ed.2d 78, 102 S.Ct. 940 [948] (1982). The difference between unreviewable legal interpretations and factual claims open under *Jackson* establishes a formidable problem of implementation.

*Id.* at 102.

In illustrating this very cogent evaluation of the law under *Jackson,* the *Bates* court "[c]onsider[ed] four situations in which a defendant might say that the evidence is insufficient...." *Id.* The analysis of *Jackson* in *Bates* mirrors the petitioner's due process claim here. Specifically, the *Bates* court outlined several scenarios, two of which are relevant here, that illustrate the complexities of this issue:

> (2) Defendant believes that the combination of elements X, Y, and Z is an offense. The court disagrees, holding that the state need prove only X and Y. After a trial at which the prosecution introduces no evidence of Z, the court convicts the defendant.

ny murder, and a jury found the petitioner guilty of same. To take the petitioner's argument to an extreme and claim that the defendant should have been charged with involuntary murder is a very nebulous proposition. Undoubtedly, a proposition of this nature requires a reanalysis of the whole prosecution of the case, the defendant's theory of the case, and the entire state law trial procedure. This court understands that is

(3) State law defines the combination of elements X, Y, and Z as criminal. Defendant believes that element Z can be satisfied only if the state establishes fact Z', but the state court disagrees. After a trial at which the prosecution introduces some evidence of Z but does not establish Z', the court convicts the defendant.

*Id.*

After describing the various hypothetical situations, the *Bates* court explained:

> Case 2, by contrast, presents a pure question of state law. If the state court is correct in its interpretation of the statute, then the evidence is sufficient; whether the state court correctly understands the law is a question beyond the reach of a federal court on collateral attack. *E.g., Jones v. Thieret; Garcia v. Perringer,* 878 F.2d 360, 362 (11th Cir.1989); *Holt v. Wyrick,* 649 F.2d 543, 547 (8th Cir.1981). *But cf. McGuire v. Estelle,* 902 F.2d 749 (9th Cir.1990), *rehearing denied,* 919 F.2d 578 (1990), *cert. granted,* [—— U.S. ——] 112 L.Ed.2d 1177, 111 S.Ct. 1071 (1991). Case 3 is just a variant of case 2. What is essential to establish an element, like the question whether a given element is necessary, is a question of state law. To say that state law "rightly understood" requires proof of Z', and that the evidence is insufficient because the prosecution failed to establish this, is to use *Jackson* as a back door to review of questions of substantive law. Whenever courts consider that possibility expressly they reject claims that convictions should be reversed because state courts misunderstood or misapplied state law. *E.g., Gryger v. Burke,* 334 U.S. 728, 731, 92 L.Ed. 1683, 68 S.Ct. 1256 [1257] (1948). An equally firm rebuff is appropriate when the same claim appears in *Jackson*ian guise, we concluded in *Jones.*

*Id.* While this court is fully aware of the differences between the due process claim here and the issue in *Bates,* there is no question that there are many parallels worthy of consideration.

In light of the foregoing analysis of the statutes on their face and as applied, this court finds no constitutional due process violation.[12]

### III.

Next, the petitioner asserts a claim based on prosecutorial misconduct and proffers several excerpts from the prosecution's closing arguments in illustration.[13] Recently, in *United States v. Reed,* 2 F.3d 1441, 1450 (7th Cir.1993), the Seventh Circuit, speaking through Judge Coffey, explained the requisite considerations on the issue of prosecutorial misconduct:

> To succeed in his claim, [the petitioner] must demonstrate that "the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181, 91 L.Ed.2d 144, 106 S.Ct. 2464 [2471] (1986) (citation omitted).
>
>> "When analyzing allegations of prosecutorial misconduct during argument, we look at the disputed remarks in isolation to determine if they are proper. If the statements are proper, our analysis ends. If the statements are improper, our second step is to look at the remarks in light of the entire record to determine if the defendants were deprived of a fair trial."
>
> *United States v. Badger,* 983 F.2d 1443, 1450 (7th Cir.), *cert. denied,* [—— U.S. ——] 124 L.Ed.2d 293, 113 S.Ct. 2391 (1993). In *Badger,* we held that five factors must be considered when weighing the propriety of a prosecutor's comment:

not part of the claim here, but it is certainly an implication in the due process argument.

**12.** Although this court's discussion of the due process claim is complete, it would be remiss not to mention to recent Seventh Circuit opinion in *Willis v. Aiken,* 8 F.3d 556 (7th Cir.1993). In *Willis,* the Seventh Circuit, speaking through Judge Ripple, examined an issue of this nature

under the strict retroactivity requirements under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

**13.** All prosecutorial misconduct claims involving the penalty phase of the trial are moot insofar as the Indiana Supreme Court ordered that the State conduct a new penalty and sentencing hearing.

"1) the nature and seriousness of the prosecutorial misconduct, 2) whether the prosecutor's statements were invited by conduct of defense counsel, 3) whether the trial court instructions to the jury were adequate, 4) whether the defense was able to counter the improper argument though rebuttal, and 5) the weight of the evidence against the defendant."

*Id.*

■ The Attorney General argues that the petitioner has procedurally defaulted on all of allegations of unchallenged prosecutorial misconduct except for a singular instance. More directly, the Attorney General argues that the various allegations of prosecutorial misconduct are unfounded. The Attorney General maintains that the only claim not defaulted involves the "hot dog" comment. Specifically, the petitioner alleges the following portion of the closing argument was improper:

Does the man speak baloney, garbage, that is corroborated nowhere, or, dirtbag or not, does he speak the truth, because I can prove it five ways from Sunday, and I've got a list over here. It's my responsibility, working for Steve, once in awhile to teach seminars, to lecture to our deputies and to other deputies regarding how you do a final argument. Okay? I'm supposed to be a hotdog. The first think [sic] I tell them is, don't use your notes. I'm going to use my notes. The reason is I've got too many things to read or I'll miss 'em. There are thirteen separate, distinct, relevant and overwhelming items of evidence. . . .

*See Respondent's Supplemental Memorandum.*

In light of the abovementioned passage from the prosecutor's closing argument, the petitioner alleges that an objection should have been lodged to call attention to the fact that the prosecutor's argument was based on his personal opinion and was intertwined with references to his official position and stature in the government.

In *Resnover v. Pearson,* 965 F.2d 1453 (7th Cir.1992), *cert. denied sub nom. Resnover v. Carter,* — U.S. ——, 113 S.Ct. 2935, 124 L.Ed.2d 685 (1993), the Seventh Circuit eval-uated the closing argument of a prosecutor in light of the allegation that the prosecutor has "unfairly called attention to a personal friendship between the prosecutor and Jack Ohrberg [a police officer involved in the underlying criminal investigation.] *Id.* Specifically, in the closing argument, the prosecutor stated:

It's been a long time since these guys killed my detective. This gun, in his hands took my detective's life. There's another rule that says we [lawyers] can't testify, we can't give facts. Well, I was Jack Ohrberg's associate in law enforcement for a long time. And as he was Homicide Supervisor and, I was his lawyer. . . . Now I don't want these guys convicted of anything because my friend died. I want them convicted because they did it.

*Id.*

On this issue, the *Resnover* court explained that "[t]he comments about a relationship between Ohrberg and the prosecutor did not deprive [the petitioner] of any right." *Id.* The *Resnover* court resolved that "[t]he prosecutor conveyed no substantive, personal information to the jury through these comments." *Id.* More importantly, the *Resnover* court explained that "[i]ndeed, looking at the prosecutor's presentation as whole, it is clear that the prosecutor focused the jury's attention on the admitted evidence." *Id.* In invoking the "hotdog" reference, the prosecutor commented on his teaching relationship with other prosecutors in the office. Although there is a personal reference, it is solely used as a tool to recite a laundry list of evidentiary considerations to the jury. Here, as in *Resnover,* this court finds that the prosecutor "conveyed no substantive, personal information," and "the prosecutor focused the jury's attention on the admitted evidence." *Id.*

■ The petitioner also asserts prosecutorial misconduct in the form of false testimony. On this issue, the petitioner argues that the prosecution misled the jury by failing to disclose the actual agreement reached between the State and a jail informant regarding his testimony. An extensive post-trial hearing was held on this issue and this issue

was also reviewed by the Indiana Supreme Court in the direct appeal. A substantial quotation from *Burris I* is in order considering the fact-intensive nature of this issue:

One of the chief witnesses for the prosecution was William Allen Kirby. Kirby had shared a cell with defendant Burris in the Marion County Jail where the defendant admitted his involvement and culpability in the murder. Kirby agreed to testify against the defendant and recounted the defendant's story as follows: The defendant and his friends were in need of money. They entered a dance contest but failed to win anything. They took a cab to the "M & L Club" (Kirby said he was not sure "M & J Social Club" was what the defendant said but he knew the name was alphabetical) and on the way to the club, the defendant saw an envelope containing money on the front seat of the cab. Kirby asked why the men did not take the money at that time. The defendant replied they were not prepared to do so because they did not have their "roscoes" (pistols).

*Id.* at 176.

Here, in seeking a writ of habeas corpus, the petitioner revisits this issue and again "argues that his conviction should be reversed because the State did not disclose the 'deal' it struck with a witness, William Kirby, in order to get Mr. Kirby to testify." *Id.* at 183. In evaluating this claim, the Indiana Supreme Court revisited the facts at issue:

Kirby testified, as related above, about the murder as it was described to him by the defendant. This encounter took place in the Marion County Jail. At that time, Kirby was facing two counts of robbery, a count of being a habitual offender, and a minor drug charge. Kirby had reached a tentative agreement to plead guilty to the robberies and receive two fifteen-year sentences, to be served concurrently, while the habitual offender count would be dropped. The State alleges that after this plea agreement had already been reached, Kirby was asked to testify about the murder. In exchange for Kirby's cooperation in testifying, another five years would be taken off the robbery sentences. During the trial, Kirby stated that it was his friendship with the deceased, not the five-year reduction, that influenced his decision to testify. The defendant argues that this statement by Kirby and the events surrounding the plea agreement misled the jury and he should be awarded a new trial.

When William Kirby took the stand in December, 1980, the prosecutor asked him if it was true that he was serving a ten year sentence as a result of pleading guilty to charges of robbery. Kirby answered that this was true. The guilty plea had been entered a few months earlier in August, 1980. The prosecutor then asked questions concerning Kirby's relationship with the defendant. From the questions and answers, it appeared that Kirby had been incarcerated, along with the defendant, in the Marion County Jail on February 7, 1980. The charges which caused Kirby to be arrested were the same charges that his later guilty plea agreement was based upon. The following exchange then took place between the prosecutor and Kirby:

Q Now, prior to that date, before the seventh (7th) of February, had you already reached an agreement with the State of Indiana with regard to a plea of guilty?

A Yes.

Q And you were awaiting . . .

A Fifteen (15) . . .

Q . . . a hearing, at which time you were going to plead guilty for a sentence of fifteen (15) years, is that right?

A Right.

Q Subsequent to your proving information to me with regard to this case that plea agreement was amended, was it not, so that you would do a sentence of ten (10) years and not fifteen (15)?

A It was.

Kirby then recounted in great detail the events surrounding the murder as they had been told to him by the defendant. Just before the direct examination concluded, the prosecutor again raised the topic of reducing the fifteen year sentence to ten years:

Q ... And your agreement with the State of Indiana to plead guilty to the charges which were pending against you at the time you had this information given to you by [the defendant] had already been reached at the time you took this statement.

A Yes.

Q And what happened was that, as a result of your agreement to cooperate and testify in this trial, you simply received a five (5) year reduction in the amount of time you would do.

A Yes, I received this, but this was not requested, you know, because I, you know, like I'm saying, you know, I am a criminal element, also. You see what I'm saying? But this was a (sic) act that I couldn't condone, this (meaning the victim) was a personal friend of mine, you know, and I told the prosecution, Prosecutor's Office, that I would testify irregardless (sic).

Q It's a fact, is it not, that at no time did you make a request for a reduction in your sentence as a condition of your testifying?

A That's right.

The defendant still argues that the prosecutor misled the jury because he did not disclose all the facts surrounding the plea agreement. By this, the defendant is referring to the State's agreement to drop the habitual offender count and impose a four year term on the minor drug charge, which would then be served concurrently with the ten year robbery sentence. This allegation was one reason for conducting a hearing on the defendant's Second Belated Motion to Correct Errors. Sifting through the transcript of the hearing, we find that the State and Kirby had tentatively reached an agreement to drop the habitual offender count and impose two concurrent fifteen year terms on the robbery charges before Kirby ever met the defendant. Kirby had a co-defendant named Sisson who pleaded guilty to robbery and received a fifteen year sentence. It appears that the prosecutor in Kirby's case felt that Sisson was more culpable than Kirby and therefore, Kirby's sentence should not exceed Sisson's term of years. Gregory Garrison, who prosecuted defendant Burris, testified that he was informed by other prosecutors about the tentative agreement between the State and Kirby. Garrison stated at the hearing: "I indicated to [Kirby] that his existing plea bargain of fifteen years, might be reduced to some extent, contingent upon his testimony and his successful taking of a polygraph examination...."

The prosecutor voluntarily disclosed the agreement made with Kirby: a reduction of his fifteen year sentence to ten years. The defense had access to the materials surrounding the guilty plea and could have brought out these other allegations in order to try to impeach Kirby on cross-examination.... The prosecutor is only *obligated to disclose what inducement was* used to gain the cooperation of the witness. In this case, the jury was informed that the witness' fifteen year sentence was the result of a plea agreement and that it was reduced by five years as a result of Kirby's testimony. The prosecutor did not have to tell about the habitual offender count being dropped because that matter had been settled before Kirby agreed to testify. As for the defendant's other allegation that Kirby lied when he stated that he needed no inducement to testify, there is nothing in the record to support this allegation. Kirby had insisted all along that he would testify even if he did not receive that five year reduction. Although the final guilty plea was made contingent upon his presence as a witness, there still was no evidence that the State had to do this in order to gain his testimony. The State may have done this in order to fortify its position and warn Kirby that he could not be equivocal; however, it is still true, as was brought out before the jury, that Kirby never insisted upon the five year reduction before he agreed to testify. Thus, the jury was able to judge, both effectively and properly, the witness' credibility.

*Id.* at 183–85.

Recently, in reported decisions there have been extremely unfortunate examples of prosecutorial misconduct. *See U.S. v. Burnside,* 824 F.Supp. 1215 (N.D.Ill.1993). There,

Judge Holderman's comprehensive opinion reads like a textbook in how a federal prosecution should *not* be conducted. With all deference, the alleged prosecutorial misconduct in this case does not even come close to violating the mandates shown there. *See also U.S. v. Andrews,* 824 F.Supp. 1273 (N.D.Ill.1993). The damning testimony against this petitioner in his state trial, was that of his erstwhile cell mate by the name of William Kirby. The Supreme Court of Indiana dealt extensively with the Kirby testimony and its implications. Certainly, this Court under 28 U.S.C. § 2254(d) has a right to presume as correct the facts found by the highest court in Indiana, which are supported by the record, but is certainly entitled to make an independent view of the record and arrive at an independent judgment as to whether or not those facts show a violation of the Constitution of the United States. In regard to the testimony of William Kirby, there is no constitutional error in admitting his testimony, and no showing of prosecutorial misconduct with reference to it.

 Finally, the petitioner lists several other incidents of prosecutorial misconduct. The Attorney General maintains that those incidents have been procedurally defaulted; and are, therefore, barred from review under § 2254. To be sure, it is improper for the prosecutor to express his personal opinion about a defendant's guilt. *See United States v. Young,* 470 U.S. 1, 17, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985). Here, this court must decide whether the prosecutor engaged in "permissible comment upon what the evidence showed and not a statement of his personal opinion regarding the defendant's guilt." *United States v. Auerbach,* 913 F.2d 407 (7th Cir.1990).[14] The petitioner also asserts that the prosecutor improperly bolstered his case by referring to his position as a government official. "It is impermissible for the prosecutor to strengthen its case by invoking the prestige of the United States

government." *Id.* (citing *United States v. Eley,* 723 F.2d 1522, 1525 (11th Cir.1984)). "A single reference to the fact that the prosecutors represent the government does not necessarily represent an attempt to improperly sway the jury's evaluation of the evidence." *Id.* It is manifest, as Justice Sutherland so correctly stated, that the prosecutor "may strike hard blows, [but] is not at liberty to strike foul ones." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). This court will not spend numerous pages of this opinion evaluating procedural default and the specifics of prosecutorial misconduct on this claim in light of the recent and dispositive Supreme Court opinion of *Brecht v. Abrahamsom,* — U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *See also United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (the Supreme Court applied a "harmless error" analysis to prosecutorial misconduct).

In *Brecht,* the Supreme Court revisited harmless error within the framework of habeas corpus and prosecutorial misconduct. In *Brecht,* the Court, speaking through Chief Justice Rehnquist, considered the issue of the applicable standard for the review of federal constitution error. In *Brecht,* the petitioner "was serving time in a Georgia prison for felony theft when his sister and her husband[, who was a county prosecutor,] ... paid the restitution for petitioner's crime and assumed temporary custody of him." *Id.* The petitioner's sister and husband brought the petitioner "home with them to ... Wisconsin, where he was to reside with them before entering a halfway house." *Id.* The petitioner's behavior while residing with his inlaws was a source of very serious contention especially on the topic of drinking alcohol. On the day of the crime, the "petitioner broke into their liquor cabinet and began drinking." *Id.* When his sister's husband returned home, the petitioner shot him with

14. In *Auerbach,* the court highlighted the following cases:

> *See, e.g., United States v. Spivey,* 859 F.2d 461, 466 (7th Cir.1988) (prosecutor's characterization of defendants as "con men" constituted reasonable inference based on the evidence, not the prosecutor's personal opinion on the

merits of the case); *United States ex rel. Clark v. Fike,* 538 F.2d 750, 758–59 (7th Cir.1976) (prosecutor's statement that defendant "has committed a dastardly crime, he should be punished" not improper; additional statement that "You know it, I know it and the courtroom knows it" was improper).

a rifle he had found in an upstairs room. The shot was fatal.

The petitioner sought a writ of habeas corpus based on the decision in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), which prohibits a prosecutor's use of post-*Miranda* silence. The District Court agreed with the petitioner that the precepts of *Doyle* were violated during the state criminal trial. More importantly, the District Court found that the violation amounted to error that was harmless beyond a reasonable doubt. In so doing, "the District Court based its harmless-error determination on its view that the State's evidence of guilt was not 'overwhelming,' and that the State's references to petitioner's post-*Miranda* silence, though 'not extensive,' were 'crucial' because petitioner's defense turned on his credibility." *Id.,* —— U.S. at ——, 113 S.Ct. at 1715. The District Court granted the writ on this basis.

The Seventh Circuit reversed. The Seventh Circuit "concluded that the State's references to the petitioner's post-*Miranda* silence violated *Doyle,* but it disagreed with both the standard that the District Court had applied in conducting its harmless-error inquiry and the result it reached." *Id.* at ——, 113 S.Ct. at 1716. The Seventh Circuit held "that the *Chapman v. California,* 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] (1967) ], harmless-error standard does not apply on federal habeas." *Id.* According to the Seventh Circuit, the test is whether the *Doyle* violation "had substantial and injurious effect or influence in determining the jury's verdict," which is the standard enunciated by the Supreme Court in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *Id.*

On this issue, the Court initially explained that "a *Doyle* error fits squarely into the category of constitutional violations which we have characterized as 'trial error.'" *Id.,* —— U.S. at ——, 113 at 1717. Next, the Court pointed out that the federal habeas statute "says nothing about the standard" and that "[i]n the absence of any express statutory guidance from Congress, it remains for this Court to determine what harmless-error standard applies on collateral review...."

*Id.* at ——, 113 S.Ct. at 1719. Finally, and most importantly, the Court explained that:

The principle that collateral review is different from direct review resounds throughout our habeas jurisprudence. *See e.g., Wright v. West,* 505 U.S. [——], 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (opinion of THOMAS, J.); *Teague v. Lane,* 489 U.S. 288, 306, 109 S.Ct. 1060, 1072, 103 L.Ed.2d 334 (1989) (opinion of O'CONNOR, J.); *Pennsylvania v. Finley,* 481 U.S. 551, 556–557, 107 S.Ct. 1990, 1994, 95 L.Ed.2d 539 (1987); *Mackey v. United States,* 401 U.S. 667, 682, 91 S.Ct. 1160, 1174, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in judgments in part and dissenting in part). Direct review is the principal avenue for challenging a conviction. "When the process of direct review—which, if a federal question is involved, includes the right to petition this Court for a writ of certiorari—comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle,* 463 U.S. 880, 887, 103 S.Ct. 3383, 3392, 77 L.Ed.2d 1090 (1983).

In keeping with this distinction, the writ of habeas corpus has historically been regarded as an extraordinary remedy, "a bulwark against convictions that violate 'fundamental fairness.'" *Engle v. Isaac,* 456 U.S. 107, 126, 102 S.Ct. 1558, 1571, 71 L.Ed.2d 783 (1982) (quoting *Wainwright v. Sykes, supra,* 433 U.S. [72] at 97, 97 S.Ct. [2497] at 2511 [53 L.Ed.2d 594] [ (1977) ] (Stevens, J., concurring)). "Those few to are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia,* 372 U.S. 391, 440–441, 83 S.Ct. 822, 850, 9 L.Ed.2d 837 (1963). See also *Kuhlmann v. Wilson,* 477 U.S. 436, 447, 106 S.Ct. 2616, 2623, 91 L.Ed.2d 364 (1986) (plurality opinion) ("The Court uniformly has been guided by the proposition that the writ should be available to afford

relief to those 'persons whom society has grievously wronged' in light of modern concepts of justice") (quoting *Fay v. Noia*, *supra*, 372 U.S. at 440–441, 83 S.Ct. at 850); *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 2785, n. 5, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment) (Habeas corpus "is designed to guard against extreme malfunctions in the state criminal justice systems"). Accordingly, it hardly bears repeating that " 'an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment.' " *United States v. Frady*, 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982) (quoting *United States v. Addonizio*, 442 U.S. 178, 184, 99 S.Ct. 2235, 2239, 60 L.Ed.2d 805 (1979)).

*Id.*, —— U.S. at —— – ——, 113 S.Ct. at 1719–20. Therefore, the *Brecht* Court held that the requisite standard was whether the prosecutorial misconduct "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* This court finds that the language of *Brecht* bars the claims of prosecutorial misconduct regardless of whether those claims were properly framed under 29 U.S.C. § 2254 or procedurally defaulted. The court will take up the issue of ineffective assistance of counsel separately in this opinion.

## IV.

■ The petitioner also asserts a claim based on the information. Specifically, the petitioner maintains that "[t]he issue is controlled by *Kreck v. Spalding*, 721 F.2d 1229 (9th Cir.1983), which holds that an information which affords the State the opportunity to proceed on alternative theories at trial violates fundamental fairness and, therefore, the Due Process Clause." *See Petitioner's Memorandum.*

This court notes that in *Bae v. Peters*, 950 F.2d 469, 478 (7th Cir.1991), the Seventh Circuit, speaking through Judge Manion, explained the parameters of this issue:

It is certainly reasonable to state that an indictment must meet general Fourteenth Amendment standards. No matter how a state chooses to charge a criminal defen-

dant, the due process clause requires that a criminal defendant receive "notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge." *Cole v. Arkansas*, 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948); *Olsen v. McFaul*, 843 F.2d 918, 930 (6th Cir.1988). In other words, a criminal defendant must receive adequate notice of the charges against him so that he may defend himself against those charges. *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir.1984). A vague indictment ... or a last-minute change in the charge could prejudice a defendant's opportunity to defend himself; if that prejudice is severe enough, a due process violation could occur. *See, e.g., id.* at 369–70; *Watson [v. Jago]*, 558 F.2d [330] at 337 [ (6th Cir. 1977) ].

*Id.* Recently, the Seventh Circuit in *Tague v. Richards*, 3 F.3d 1133 (7th Cir.1993), revisited this issue and explained that "[r]esolution of the issues turns on whether [the petitioner] was 'adequately apprised of what he had to meet' and had 'sufficient time to prepare.' " *Id.* (citing *Denton v. Duckworth*, 873 F.2d 144, 149 (7th Cir.), *cert. denied*, 493 U.S. 941, 110 S.Ct. 341, 107 L.Ed.2d 330 (1989).)

Again, invoking the mandates of the presumption of correctness, this court notes that the Indiana Supreme Court in *Burris I* indicated:

Assuming, arguendo, that this issue has not been waived, we must examine the language used in the information. Omitting captions and formal parts, the information charging defendant Burris with felony murder reads as follows:

Did kill one KENNETH W. CHAMBERS, while in the commission of Robbery, a felony, in that the said EMMETT MERRIWEATHER, JAMES THOMPSON AND GARY BURRIS, did take property from the possession of the said KENNETH W. CHAMBERS, to-wit: U.S. CURRENCY, by means of force and threat of force against the person of the said KENNETH W. CHAMBERS. Said EMMETT MERRIWEATHER, JAMES THOMPSON

AND GARY BURRIS killed KENNETH W. CHAMBERS by shooting at and against the body of the said KENNETH W. CHAMBERS, with a handgun, loaded with gun powder and metal bullets, inflicting a mortal wound upon the body of the said KENNETH W. CHAMBERS, as the result of which wound the said KENNETH W. CHAMBERS did then and there and thereby die. . . .

*Id.* at 181.

In evaluating this claim, the Indiana Supreme Court compared the information to felony-murder based on robbery as defined in *Ind.Code* § 35–42–5–1 and explained:

Defendant Burris argues that he was not charged with the crime of robbery because the information failed to allege that he knowingly or intentionally took the money from the victim. Thus, the defendant argues under Ind.Code § 35–3.1–1–2 (Burns Repl.1979) (now repealed), Burris cannot be convicted of felony murder because the information failed to set "forth the nature and the elements of the offense charged in plain and concise language. . . ." We do not find the information to be defective. An information must state the crime in words of the statute or words that convey a similar meaning. *Smith v. State,* (1983) Ind., 445 N.E.2d 998; *Askew v. State,* (1982) Ind., 439 N.E.2d 1350. The information did allege that the murder was committed "while in the commission of Robbery, a felony." Measured by the standards in Smith, the information could not have misled the defendant and he does not claim that he was misled. Instead, he makes a sufficiency argument out of this alleged error. The language of the information was sufficiently certain and particular so as to enable the accused, the trial court, and the jury to determine the crime for which the conviction was sought, and to give defendant Burris sufficient information to prepare his defense, assure against double jeopardy, and anticipate then prove which would be adduced against him. *Fadell v. State,* (1983) Ind.App., 450 N.E.2d 109. Parenthetically, we note that the jury instructions accurately state the essential elements of the crime of robbery, including the requisite states of mind. We find no harm to the defendant under this issue. *Id.*

This claim is virtually the same as the due process jury instruction issue. The only difference is that this claim centers on the information instead of the jury instructions. Again, as in section II, this court notes that the elements of a crime are an issue of state law. This court outlined the requisite considerations on this issue in great detail in section II. Here, as in section II, the petitioner has not asserted a viable claim. In addition, the due process constraints of *Bae v. Peters, supra,* have not been contravened. Finally, and most importantly, this court finds that the petitioner's contentions on the indictment process did not " 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.' " *Tague, supra* (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).

## V.

The Sixth Amendment of the United States Constitution has been interpreted by the Supreme Court to guarantee to every criminal defendant the right to effective assistance of counsel. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The Sixth Amendment is effectuated through the prism of a two-part test enunciated by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The petitioner asserts several Sixth Amendment claims. First, the petitioner asserts an ineffective claim based on disparagement by his own counsel in closing arguments. Next, the petitioner asserts an ineffective assistance claim based on counsel's failure to object and secure instructions regarding evidence that the petitioner was involved in a prior, unrelated robbery. The petitioner also maintains his Sixth Amendment rights were violated when counsel failed to object to prosecutorial misconduct. Next, the petitioner asserts that his counsel failed to develop critical evidence. Finally, the petitioner alleges ineffective assistance

based on counsel's failure to challenge the charging information and the accompanying jury instruction.

 Many of the abovementioned claims were discussed by the Indiana Supreme Court on either direct review or in the review of the petitioner's state post-conviction proceedings. It is important to note that state court factual findings made in the course of deciding various constitutional issues are subject to the presumption of correctness standard of 28 U.S.C. § 2254(d), which provides that "a determination after a hearing on the merits of a factual issue, made by a state court of competent jurisdiction ... shall be presumed to be correct" unless "the merits of the factual dispute were not resolved in the state court hearing." *Galowski v. Murphy,* 891 F.2d 629, 635 (7th Cir.1989), *cert. denied,* 495 U.S. 921, 110 S.Ct. 1953, 109 L.Ed.2d 315 (1990). Therefore, under section 2254(d), the court must defer to the state court's findings regarding the underlying facts of who did what to whom, when, where, and why. *Weidner v. Thieret,* 866 F.2d 958, 961 (7th Cir.1989). *See also Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

On the issue of ineffectiveness of counsel, the Seventh Circuit in *United States v. Grizales,* 859 F.2d 442 (7th Cir.1988), indicated:

> The Supreme Court has instructed that in evaluating the performance of a trial attorney we are to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2054. Appellant "has a heavy burden in proving a claim of ineffectiveness of counsel." *Jarrett v. United States,* 822 F.2d 1438, 1441 (7th Cir.1987) (citing *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064). The Supreme Court has further cautioned appellate courts to resist the temptation to "second-guess" the actions of trial counsel after conviction. *Id.* It is clear that the performance of trial counsel should not be deemed constitutionally deficient merely because of a tactical decision made at trial that in hindsight appears not

to have been the wisest choice. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *United States v. Kennedy,* 797 F.2d 540, 543 (7th Cir.1986).

*See also Fagan v. Washington,* 942 F.2d 1155 (7th Cir.1991); *D.S.A. v. Circuit Court Branch 1,* 942 F.2d 1143 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1196, 117 L.Ed.2d 436 (1992); *United States ex rel. Simmons v. Gramley,* 915 F.2d 1128 (7th Cir.1990); *Page v. United States,* 884 F.2d 300 (7th Cir.1989); *United States v. Adamo,* 882 F.2d 1218 (7th Cir.1989); *United States ex rel. Thomas v. O'Leary,* 856 F.2d 1011 (7th Cir.1988); *Buelow v. Dickey,* 847 F.2d 420 (7th Cir.1988), *cert. denied,* 489 U.S. 1032, 109 S.Ct. 1168, 103 L.Ed.2d 227 (1989); *United States v. Queen,* 847 F.2d 346 (7th Cir.1988); *United States v. Gerrity,* 804 F.2d 1330 (7th Cir.1986); *United States v. Liefer,* 778 F.2d 1236 (7th Cir.1985); *Clark v. Duckworth,* 770 F.Supp. 1316 (N.D.Ind.1991).

### A.

 The petitioner asserts a Sixth Amendment claim based on disparagement by his own counsel in closing arguments. In so doing, the petitioner points out that defense counsel made disparaging statements about the petitioner during the course of the guilt phase. Specifically, trial counsel made the following statement:

> Now then, this is a street peoples case. We've got a street person defendant. We have almost exclusively street people witnesses.... He's not the best, best one I've ever had, Burris isn't. I don't even like him. He and I have several arguments. But I'm saying he is entitled ... to everything that anybody else is. By God, I'm going to see that he gets it.

*See Petitioner's Memorandum.* In addition, the petitioner maintains the other comments made by trial counsel were objectionable:

> You can find him guilty of murder. And then we all get to come back, don't we, for that other hearing that we talked about earlier. So you can do that. Ruin my afternoon, possibly even all day tomorrow, I don't know.

*Id.*

On this issue, the petitioner highlights the thoughts of the Indiana Supreme Court in

*Burris II.* The Indiana Supreme Court found these statements to be reprehensible and that trial counsel portrayed the petitioner in an unsympathetic light. Nevertheless, the Indiana Supreme Court concluded that the petitioner was not prejudiced by the remarks because the court believed he would have been convicted of murder even in the absence of the remarks. *See Burris II,* 558 N.E.2d at 1073.

In *Julius v. Johnson,* 840 F.2d 1533 (11th Cir.1988), the Eleventh Circuit considered the ramifications of this issue under similar circumstances. In *Julius,* the petitioner "contend[ed that] counsel's closing argument during the guilt phase of the trial was prejudicial to his defense." *Id.* "Specifically, [the petitioner] point[ed] to counsel's comment that he zealously defends his clients regardless of their character." *Id.* The *Julius* court indicated that "[d]uring argument, counsel talked to the jury about the day he received his license to practice law and a promise he made to himself on that day." *Id.* The *Julius* court included the excerpt from the argument:

> [J]ust as long as I live and I walk into a courtroom, I'm going to make myself a vow, that I don't care who it is, I don't care if they're a convict, I don't care if they are the biggest liar that ever walked under the sun, if I, George Cameron, if I'm going to be thrown into that courtroom with them, I'm going to do everything that I possibly can within the elements of my profession not to do anything to make a shambles of the profession that has been good to me, but at the same time, I am going to do everything that I can for that person. I don't want anybody to ever back off and say, well, that lawyer sold them down the river; that lawyer wasn't worth two cents; that lawyer just sat there; that lawyer hasn't done his job. Not against me, I hope.

*Id.*

In evaluating these comments under the Sixth Amendment, the *Julius* court ex-

plained that at the state coram nobis hearing, counsel indicated that his "comment regarding his responsibility to defend his clients ... was [an] attempt[ ] to remind the jury of its duty to be fair to the defendant." *Id.* Furthermore, the *Julius* court indicated that "[c]ounsel testified that he was not attempting to distance himself from his client." *Id.* Most importantly, the *Julius* court explained "[w]e agree with the coram nobis court that counsel's comments did not prejudice Julius' defense." *Id.* Finally, the court concluded that "[e]ven if counsel's arguments were not particularly helpful, they certainly were not harmful enough to undermine our confidence in the correctness of the jury's verdict.[15]" *Id.*

In *Thompson v. Wainwright,* 787 F.2d 1447 (11th Cir.1986), the Eleventh Circuit, speaking through Judge Kravitch, revisited this issue. In *Thompson,* the court evaluated the Sixth Amendment connotations of the following segment from the closing statement of the petitioner's counsel:

> Your Honor, members of the jury: what I said to you yesterday was right. I asked you a key question, didn't I? Can you leave your minds open even if you hear horrendous evidence? Can you keep your minds open and not put in there the old Biblical term, "An eye for an eye and a tooth for a tooth," before you hear it all.

> You know something here—do you know that the court-appointed lawyer, me, is the only person in this room with William Thompson? There is no mother. There is no father. There are no cousins or aunts or uncles or pastors. This man is an absolute total loser, and we might·shrug our shoulders and say, "Well, after all, look what he did to this poor girl. Let's do it to him."

*Id.* at 1454 n. 5.

The *Thompson* court compared to above-mentioned statements to the unconstitutional statements contained in *King v. Strickland,*

---

**15.** The *Julius* court used another Eleventh Circuit case as a benchmark for measuring whether the defense counsel's closing argument could be considered a Sixth Amendment violation. In *King v. Strickland,* 714 F.2d 1481 (11th Cir.

1983), the Eleventh Circuit examined a closing argument and indicated that "counsel separated himself from his client, conveying to the jury that he had reluctantly represented a defendant who had committed a reprehensible crime." *Id.*

714 F.2d 1481, 1491 (1983), *reinstated,* 748 F.2d 1462 (11th Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2020, 85 L.Ed.2d 301 (1985). The *Thompson* court explained that the court in *King* "granted relief on a claim of ineffective assistance of counsel based in part on a closing argument which 'did more harm than good.'" *Id.* at 1464. The *Thompson* court explained that the abovementioned closing argument "may have gone beyond what was necessary ..., however, to further critique the closing; reviewing courts must not unnecessarily "grade counsel's performance," *Strickland v. Washington,* [466 U.S. at 697] 104 S.Ct. at 2070, and this admonition seems particularly compelling in the case of closing argument, an inherently subjective task." *Id.* Finally, the *Thompson* court explained that "in light of the overwhelming evidence ... [the petitioner] has failed to show a reasonable probability that the closing argument ... changed the outcome." *Id.*

Here, as in *Julius* and *Thompson,* this court finds that the petitioner was prejudiced by these statements. This court agrees with the Indiana Supreme Court—defense counsel's arguments were repressible and inappropriate. This court notes, however, that even though the abovementioned remarks satisfy the first part of the *Strickland* test. The second part of the test is more elusive especially in light of the reformulation recently crafted by the Supreme Court in *Lockhart v. Fretwell,* —— U.S. ——, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

In order to assert a viable Sixth Amendment claim, not only must the petitioner satisfy the first part of the *Strickland* test, the petitioner must also illustrate how the error prejudiced the result of the trial. This is a difficult task. Recently, the Supreme Court restructured the second part of the *Strickland* test in *Lockhart v. Fretwell, supra,:*

> Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error

may grant the defendant a windfall to which the law does not entitle him.

*Id.* at ——, 113 S.Ct. at 842–43. In reevaluating the analysis under the *Strickland* test, the Court posited a slightly more restrictive test:

> It focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him.

*Id.* at ——, 113 S.Ct. at 844.

On the issue of prejudice, the Attorney General points out that in *Burris II,* the Indiana Supreme Court recounted some of that evidence adduced at trial:

> The victim was a Northside Cab Company driver. Prior to his last cab run Thelma Williams called the cab company on Burris' request. Later that night a witness saw Burris destroy a cab driver's run sheet. The police found the victim's cab outside the apartment where Burris was staying and found the murder weapon inside the same apartment.

*See Burris II* at 1073 n. 3. In addition to the evidence catalogued by the Indiana Supreme Court, the Attorney General indicates that the petitioner possessed the murder weapon before and after the murder and also had the money from the robbery in his pockets. *Id.*

The Attorney General's arguments on this issue are furnished for purposes of the second part of the *Strickland* test. This court finds this argument convincing. The addition of the refinement added in *Fretwell* is even more detrimental to the petitioner. Therefore, this court finds no constitutional error on this claim. *See also Durrive v. United States,* 4 F.3d 548 (7th Cir.1993).

**B.**

The petitioner asserts an ineffective assistance claim based on counsel's failure to object and secure instructions regarding evidence that the petitioner was involved in a prior, unrelated robbery. In making this argument, the petitioner maintains that dur-

ing the direct examination of State's witness Carol Wilkins, the prosecutor deliberately elicited testimony regarding an unrelated robbery allegedly perpetrated by the petitioner on the same evening as the murder at issue in the trial. This court notes that the prosecutor adduced the following testimony:

Q Did you have a conversation, or did you hear a conversation, in which Mr. Burris said what he'd been doing while he was gone?

A Yes, I did.

Q What did he say he'd been doing?

A He said that he went and stuck up somebody on Sherman.

Q Did he say what he got when he stuck them up?

A Well, he came back with a thirty-eight (.38).

Q A gun?

A Uh huh.

*See Petitioner's Memorandum.*

On this issue, the petitioner indicates that "evidence of a prior unrelated robbery alleged to have occurred early in the same evening as the charged event, would lead any jury toward conviction because such evidence suggests bad character as well as a propensity toward the commission of robberies." *Id.* On this issue, the petitioner claims ineffective assistance insofar as "defense counsel did not attempt to preclude the reference, did not object when the reference was made, nor did counsel seek curative instructions." *Id.*

In response on this issue, the Attorney General of Indiana argues that this testimony is not clearly objectionable. In so doing, the Attorney General incorporates the reasoning of the Indiana Supreme Court on this issue. In *Burris I,* the Indiana Supreme Court indicated:

This [event] appears to have been a tactical decision by defense counsel not to strike the answer or cross-examine Wilkins. A perusal of the record indicates that the questioning may have been used to have Wilkins identify the murder weap-

on in the [petitioner's] possession prior to the murder. The prosecution did not pursue the issue of a separate robbery and Wilkins' comment about the robbery was made in passing and in the context of her recognition of the gun. An objection might have drawn more attention to the other alleged robbery. Regardless, this alleged error does not rebut the strong presumption of defense counsel's competency. . . .

*Id.* at 193.

The abovementioned arguments highlight some of the difficulties inherent in Rule 404(b) of the Federal Rules of Evidence. Recently, in *United States v. McCarthur,* 6 F.3d 1270 (7th Cir.1993), the Seventh Circuit, speaking through Judge Rovner, explained:

Rule 404(b) prohibits the admission of "evidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). Such evidence may be admitted for some other purpose, however, such as to prove the defendant's intent, knowledge or absence of mistake or accident. Id. In determining whether to admit evidence of prior bad acts under this rule, the district court must consider whether "(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice." *United States v. Levy,* 955 F.2d 1098, 1102 (7th Cir.) (quoting *United States v. Zapata,* 871 F.2d 616, 620 (7th Cir.1989)), *cert. denied,* —— U.S. ——, 113 S.Ct. 102, 121 L.Ed.2d 62 (1992).

*Id.*[16]

It is possible to conceive that an objection should have been lodged during the abovementioned juncture. However, even if

**16.** This court also notes that the State of Indiana adopted the language of this rule in *Lannan v. State,* 600 N.E.2d 1334 (1992). In *Lannan,* the Indiana Supreme Court noted that Rule 404(b) "is completely consistent with [Indiana's] case

defense counsel objected on 404(b) grounds or an objection of a similar nature, it is very possibly that the trial court would have allowed the evidence into the trial. *See, e.g., United States v. Hamilton*, 992 F.2d 1126 (10th Cir.1993). Undoubtedly, the difficulty in this equation for the trial court is deciding on whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. A fair decision on the use of this evidence under 404(b) could allow for the introduction of this testimony. This court notes that "counsel's failure to object to Rule 404(b) evidence is insignificant, where ... it is unlikely that the objection would have been sustained." *United States v. Snyder*, 872 F.2d 1351 (7th Cir. 1989). It should also be noted that if the trial court had overruled the objection, the evidence would have come in and defense counsel would have highlighted this decision in the eyes of the jury.

Recently, the Seventh Circuit in *Biggerstaff v. Clark*, 999 F.2d 1153 (7th Cir.1993), discussed the convergence of Rule 404(b) within the polemics of the Sixth Amendment right to effective assistance of counsel. In consideration of this issue, the *Biggerstaff* court outlined the factual situation requisite to a consideration of the claim:

> Evidence of Biggerstaff's prior conviction for third degree arson was admitted during cross-examination, when Biggerstaff took the witness stand in his own defense. The prior conviction resulted from an incident in which Biggerstaff set fire to his own car in an attempt to defraud his insurance company. Trial counsel's motion in limine to exclude this evidence was denied, and his objection as to the admissibility of the evidence when the question was asked at trial was overruled. Biggerstaff's ineffective assistance of counsel claim is based on trial counsel's failure to request a limiting instruction admonishing the jury to consider the defendant's prior conviction only as evidence of his propensity for false statement, and not as evidence of guilt as to the crime charged.

*Id.*

In evaluating the Sixth Amendment ramifications presented by the abovementioned

facts, the *Biggerstaff* court indicated that "[t]rial counsel's two attempts to exclude the prior conviction testimony indicate that he was aware of the potential danger of such testimony." *Id.* This court notes that there is a clear difference between counsel's actions in *Biggerstaff* and here in this petition. However, the *Biggerstaff* court explained that "[t]he evidence was admissible ... for the purpose of reflecting on the defendant's credibility, but not as evidence of guilt of this crime." *Id.* (citing *Ashton v. Anderson*, 258 Ind. 51, 279 N.E.2d 210 (Ind.1972)). Finally, on whether the failure to request a limiting instruction, the *Biggerstaff* court explained:

> Generally courts which have reviewed the issue on an ineffective assistance of counsel claim have either held that the conduct was reasonable under the circumstances or did not affect the ultimate result of the trial, refusing to hold that failure to request such an instruction alone results in constitutionally ineffective assistance of counsel. *Julius v. Johnson*, 840 F.2d 1533 (11th Cir.1988); *Williams v. Armontrout*, 679 F.Supp. 916 (W.D.Mo.1988); *People v. Tuma*, 119 A.D.2d 606, 500 N.Y.S.2d 777 (N.Y.App.Div.1986). *Cf. People v. Zimmerman*, 102 Cal.App.3d 647, 161 Cal. Rptr. 669 (Cal.Ct.App.1980).
>
> Having lost the admissibility issue, it would be reasonable for counsel to choose not to request a limiting instruction, making a tactical decision to forego the instruction to avoid further focus of the jury's attention on the unfavorable use that could be made of the evidence. *See United States v. Malik*, 928 F.2d 17 (1st Cir.1991); *United States v. Miller*, 283 U.S.App.D.C. 9, 895 F.2d 1431, 1439; *Williams v. Armontrout*, 679 F.Supp. 916, 945 (W.D.Mo.1988).

*Id.* Although there are distinct factual difference in comparison to the facts at issue in this petition, the *Biggerstaff* court's comment on jury dynamics provides insight into a possible strategy.

 It is a difficult task to evaluate this issue under the first part of the *Strick-*

law on this question." *Price v. State*, 619 N.E.2d 582 (1993).

*land* test insofar as "[r]ule 404(b) has engendered a tremendous amount of litigation and has inspired more judicial opinions, and arguably more confusion, than any other section of the [Federal Rules of Evidence.]" *Edward Becker & Aviva Orenstein, The Federal Rules of Evidence after Sixteen Years,* 142 F.R.D. 519 (1992). This court notes that this counsel's performance must be evaluated in light of the totality of the circumstances of the case. *United States v. Adamo,* 882 F.2d 1218, 1228 (7th Cir.1989). More importantly, there is a strong presumption that counsel rendered reasonably effective assistance of counsel, and the petitioner must effectively refute the presumption. *Pittman v. Warden, Pontiac Correctional Center,* 960 F.2d 688 (7th Cir.1992); *Montgomery v. Petersen,* 846 F.2d 407 (7th Cir.1988). The first part of the *Strickland* test requires the petitioner to illustrate that trial counsel's representation fell below an objective standard of reasonableness. *Montgomery v. Petersen,* 846 F.2d 407 (7th Cir.1988). Trial counsel's performance will not be deemed constitutionally deficient "merely because of a tactical decision made at trial that in hindsight appears not to have been the wisest choice." *United States v. Grizales,* 859 F.2d 442, 447 (7th Cir.1988). *See also Drake v. Clark,* 14 F.3d 351 (7th Cir.1994). Although it may be possible to make a compelling argument with the first part of the *Strickland* test on this issue, this court finds no prejudice to the petitioner under the second part of the *Strickland* test.

## C.

Next, the petitioner maintains his Sixth Amendment rights were violated when counsel failed to object to prosecutorial misconduct. Specifically, the petitioner maintains that his trial counsel failed to object at various junctures during the prosecutor's closing argument. Specifically, the petitioner contends that the prosecutor used his official position to influence the jury and injected personal and official opinion regarding the quality of the states case. On this issue the petitioner argues that such errors are particularly harmful because prosecutorial arguments "while wrapped in the cloak of State authority have a heightened impact on the jury." *Drake v. Kemp,* 762 F.2d 1449, 1459 (11th Cir.1985). This court dealt thoroughly with the prosecutorial issues in section III of this opinion. In that section, this court found that there was nothing in the prosecutor's closing arguments so improper as to *require* an objection by counsel. Nor is there any viable argument on the second part of the *Strickland* test.

## D.

Next, the petitioner asserts that his counsel failed to develop critical evidence. In making this assertion, the petitioner maintains that his attorneys should have investigated and brought out two alleged discrepancies in the testimony of a jail informant about his plea agreement with the State. This argument is a reformulation of the claim outlined by the petitioner on the issue of prosecutorial misconduct as it relates to the testimony of the cellmate. The angle of approach is the only difference. Here, the petitioner argues that trial counsel failed in their duty to conduct a reasonable investigation regarding the jail informant. This argument is essentially a reformulation of the argument that the prosecutor failed to reveal important information relevant to the testimony of the cellmate.

For the purposes of ineffective assistance, the Court need not determine whether counsel should have pursued this line of inquiry at trial because the issue was brought out after the trial and was found by the trial court and the Indiana Supreme Court to be without merit. Specifically, the Indiana Supreme Court examined the details in this claim and this court reexamined the details in part III of this opinion. These findings are subject to the presumption of correctness. This court notes that this entire claim is fact-intensive and state court findings of fact are correct if the findings are made after a hearing on the merits and are fairly supported by the record.

The facts outlined by the Indiana Supreme Court precludes a determination of whether counsel's alleged inadequate preparation was objectively unreasonable or whether any additional preparation would reasonably have

affected the outcome resulting in an unfair trial. *United States ex rel. Cross v. De Robertis,* 811 F.2d 1008, 1016 (7th Cir.1987) In light of the full analysis given to this issue by the Indiana Supreme Court, this court finds no Sixth Amendment violation especially in light of the second prong of the *Strickland* test.

### E.

 Finally, the petitioner alleges ineffective assistance based on counsel's failure to challenge the charging information and the accompanying jury instruction. Again, this court has dealt with these issues specifically in sections II and IV, and there is no viable argument on the first part of the *Strickland* test for either the information or the jury instruction. The Supreme Court of Indiana explained that the information charging this crime did not incorrectly state the elements of the crime. Basically, the Due Process Clause of the Fourteenth Amendment requires that a defendant be given adequate notice of the offense charged and a sufficient opportunity to defend against that charge. *See Denton v. Duckworth,* 873 F.2d 144, 149 (7th Cir.), *cert. denied,* 493 U.S. 941, 110 S.Ct. 341, 107 L.Ed.2d 330 (1989). Certainly, as outlined in part IV of opinion, this information passes due process constitutional muster. In addition, this court finds no prejudice under the second part of the *Strickland* test.

### VI.

The briefs filed before this Court by both Mr. Uhl for the Attorney General of Indiana and Professor Vandercoy for the petitioner are excellent and most helpful. This Court is especially grateful for the first-rate professional services of Professor Vandercoy of the Valparaiso University School of Law, who has acted as appointed counsel for this petitioner in this proceeding.

The petition for a writ of habeas corpus under 28 U.S.C. § 2254 is now **DENIED.**

**IT IS SO ORDERED.**